**Opinion issued November 5, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00852-CV

———————————

### EARL MANGIN, JR., M.D. AND ZBIGNIEW WOJCIECHOWSKI, M.D., Appellants

### V.

### MELISSA WENDT, INDIVIDUALLY, AND AS EXECUTRIX OF THE ESTATE OF DONALD WENDT, DECEASED, AND ERIN WENDT, Appellees

On Appeal from the 270th District Court
Harris County, Texas
Trial Court Case No. 2014-05029

## O P I N I O N

This is an interlocutory appeal from a trial court's order ruling that the medical expert reports filed in support of a medical malpractice lawsuit are sufficient to allow the case to proceed against Doctors Earl Mangin, Jr. and

Zbigniew Wojciechowski. Both doctors appeal from the trial court's denial of their motions to dismiss.

Because the expert report was deficient as to Dr. Mangin, we reverse the trial court's order denying his motion to dismiss, and we remand with instructions to the court to provide the Wendts an opportunity to cure the deficiency in accordance with the statute. Because the expert reports were adequate as to Dr. Wojciechowski, we affirm the trial court's denial of his motion to dismiss.

## Background

Donald Wendt was admitted to Sugar Land Methodist Hospital with chest pain. Interventional cardiologist Dr. Earl Mangin, Jr. performed an angioplasty and implanted a stent, but during the procedure he perforated an artery. An anesthesia provider responded to a call for assistance, administered anesthesia, and attempted to establish ventilation by intubating the patient, but at first the tube was mistakenly inserted into the esophagus. Mr. Wendt's oxygen levels dropped to 70%, and he experienced cardiac arrest. Ventilation was established by alternative methods, and surgery was performed to correct the perforated artery and other complications. Unfortunately, the loss of oxygen caused irreparable brain damage, and Mr. Wendt died two days later.

Wendt's estate and his two daughters (collectively, the Wendts) sued the hospital and Dr. Mangin, Dr. Zbigniew Wojciechowski, and "Dr. Smith." The

2

petition alleged that a medical record indicated that "a 'Smith' was an anesthesiologist during the relevant periods," although no information or address for a "Dr. Smith working for or in Hospital" could be located. The petition specifically alleged that "upon inquiry Hospital staff stated that there was no Smith and Wojciechowski was the anesthesiologist during the entire relevant time," and that "Dr. Wojciechowski improperly intubated Plaintiff placing the tube in a manner that blocked Plaintiff's ability to breath, placing the tube in his esophagus." The petition additionally alleged that Dr. Wojciechowski "prepared and signed the anesthesia report indicating he was present during the procedure."

In an attempt to comply with Chapter 74 of the Texas Civil Practice and Remedies Code, the Wendts timely filed three expert reports. Both appellant doctors filed motions to dismiss the Wendts' claims challenging the adequacy of the expert reports. As to both motions, the Wendts argued in response that their reports were sufficient, and, in the alternative, the court should grant a 30-day extension to cure the reports because they had made a good-faith attempt to comply with the statute. After the motions to dismiss were filed, Dr. Wojciechowski served a discovery response indicating that Dr. Milan Sheth was the anesthesiologist who cared for Mr. Wendt and improperly intubated him.[1]

---

[1] The appellate record indicates that the hospital provided information suggesting that the Wendts had misread the medical records with respect to the role of "Dr. Smith." Dr. Wojciechowski answered an interrogatory

3

The trial court denied both doctors' motions, and both doctors appealed.

**Analysis**

The appellant doctors filed separate briefs and raised distinct arguments asserting that the court erred by denying their motions to dismiss.

A plaintiff asserting health care liability claims must serve each defendant physician or health care provider with one or more expert reports and a curriculum vitae of each expert whose opinion is offered to substantiate the merits of the claims. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a), (i); *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 42 (Tex. 2013). The statute requires that such a report must provide: (1) "a fair summary of the expert's opinions . . . regarding applicable standards of care," (2) a statement identifying "the manner in which the care rendered by the physician or health care provider failed to meet the standards," and (3) an explanation of "the causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *see TTHR Ltd. P'ship*, 401 S.W.3d at 44. "The expert report need not marshal every bit of the plaintiff's evidence," *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006), but it must "explain, to a reasonable degree, how and why the breach caused the

inquiring about the identity of "Dr. Smith" by stating: "I cannot say for certain but this may be a reference to Milan Sheth, M.D." He also said that Dr. Sheth provided anesthesia services to Mr. Wendt in the catheterization lab. Dr. Wojciechowski asserted that he "first saw the patient during transport to the operating room."

4

injury based on the facts presented." *Jelinek v. Casas*, 328 S.W.3d 526, 539–40 (Tex. 2010).

When a defendant timely files a motion to dismiss challenging the adequacy of an expert report, the trial court may take one of three actions. First, if the court concludes that the report is adequate, it may deny the motion to dismiss. *See, e.g.*, *Hillery v. Kyle*, 371 S.W.3d 482, 492 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Second, if the court concludes that the report does not constitute an objective good faith effort to comply with the statute, it must grant the motion to dismiss. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*); *Bowie Mem. Hosp. v. Wright*, 79 S.W.3d 48, 51–52 (Tex. 2002); *see also Jernigan*, 195 S.W.3d at 94. Third, if the court concludes that the report is an objective good faith effort to comply with the statute but it is nevertheless deficient in some way, it may grant the plaintiff one 30-day extension to cure the deficiency. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(c); *Scoresby v. Santillan*, 346 S.W.3d 546, 557 (Tex. 2011). Because the "purpose of the expert report requirement is to deter frivolous claims, not to dispose of claims regardless of their merits," the Supreme Court has held that "trial courts should be lenient in granting thirty-day extensions and must do so if deficiencies in an expert report can be cured within the thirty-day period." *Scoresby*, 346 S.W.3d at 554. In addition, "when the court of appeals finds deficient a report that the trial court considered adequate," the plaintiff should be

5

afforded one 30-day extension to cure the deficiency, if possible. *Leland v. Brandal*, 257 S.W.3d 204, 207 (Tex. 2008).

A report qualifies as an objective good faith effort to comply if it (1) informs the defendant of the specific conduct the plaintiff questions, and (2) provides a basis for the trial court to conclude that the plaintiff's claims have merit. *Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012); *accord Scoresby*, 346 S.W.3d at 549. Because the expert report must set forth the relevant facts upon which the expert relies, identify the applicable standards of care, and explain how the defendant's breach caused the claimant's injuries, the Supreme Court of Texas has held that a court ordinarily may look only to the "four corners" of the expert report to determine whether it constitutes an objective good faith effort to comply. *Wright*, 79 S.W.3d at 52; *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). When the question of adequacy hinges on the expert's qualifications, the court may also consider the four corners of the expert's curriculum vitae. *See Palacios*, 46 S.W.3d at 877 (noting that the inclusion of a curriculum vitae is also required by statute); *Woodard v. Fortress Ins. Co.*, No. 01-14-00792-CV, 2015 WL 1020193, at *1 (Tex. App.—Houston [1st Dist.] Mar. 5, 2015, pet. denied) (mem. op.).

We review a trial court's ruling on a motion to dismiss pursuant to Section 74.351 for abuse of discretion. *Palacios*, 46 S.W.3d at 878. A trial court

abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). In exercising its discretion, a trial court should review the reports, resolve any inconsistencies, and determine whether the reports demonstrate a good faith effort to show that the plaintiff's claims have merit. *Van Ness v. ETMC First Physicians*, No. 14-0353, 2015 WL 1870051, at *4 (Tex. Apr. 24, 2015) (per curiam).

## I.     Earl Mangin, Jr., M.D.

Dr. Mangin, the cardiologist, argues that the trial court erred by denying his motion to dismiss for want of an expert report. The Wendts provided expert reports from three physicians: (1) Dr. William J. Mazzei, an anesthesiologist; (2) Dr. Paul W. Dlabal, a practicing cardiologist; and (3) Dr. Abdul Q. Memon, a board certified anesthesiologist. With respect to the claims against Dr. Mangin, two of these reports are not objective good faith efforts to comply with the statute. Dr. Mangin argues that the third report which does offer opinions about him, Dr. Memon's report, is wholly inadequate because he is not qualified to render an opinion.

### A.     Mazzei and Dlabal reports

Dr. Mazzei's report made no assertions and drew no conclusions relevant to Dr. Mangin or to any cardiologist generally. As such, standing alone this report did

not satisfy any of the three statutory expert report requirements as to Dr. Mangin. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6).

Dr. Dlabal's report reviewed and summarized the medical records from the two days Mr. Wendt was in the hospital before his death. He opined that the cause of death was loss of oxygen to the brain, a consequence of complications of treatment for a heart attack—in particular the perforation of a coronary artery. As to causation, he wrote: "The primary cause of death was cerebral anoxia. Had coronary perforation and its attendant complications not occurred in the course of treatment, the underlying condition was, in reasonable medical probability, survivable." This report fails to satisfy the statutory requirements because it did not identify any applicable standards of care, assert that Dr. Mangin failed to comply with an applicable standard of care, or explain how a departure from an applicable standard of care caused Mr. Wendt's death. *See id.* Because Dr. Dlabal's report merely summarized the medical records, it did not inform Dr. Mangin of the conduct that the plaintiffs had questioned nor did it provide a basis for the trial court to conclude the claims have merit. *See Palacios*, 46 S.W.3d at 879.

**B.    Deficiencies in Dr. Memon's report**

Finally, we consider the report of Dr. Memon, an anesthesiologist. Dr. Mangin contends that this report is deficient and does not constitute an

objective good faith effort because Dr. Memon is not qualified to render an expert opinion about his performance of heart surgery.

When a claimant sues a physician, the petition must be supported by an expert report from a physician who is qualified to testify as an expert witness on the question of whether the defendant departed from an accepted standard of medical care causing the alleged damages. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(5); *id.* § 74.401; *Mettauer v. Noble*, 326 S.W.3d 685, 691 (Tex. App.—Houston [1st Dist.] 2010, no pet.). In particular, the expert must (1) be practicing medicine at the time he testifies or when the claim arose, (2) have "knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim," and (3) be "qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care." TEX. CIV. PRAC. & REM. CODE § 74.401(a). To determine whether a witness is qualified based on his training and experience, a trial court must consider whether the witness is "board certified or has other substantial training or experience in an area of medical practice relevant to the claim," and whether he "is actively practicing medicine in rendering medical care services relevant to the claim." *Id.* § 74.401(c).

Not every licensed physician is qualified to testify about every medical question. *Broders v. Heise*, 924 S.W.2d 148, 152 (Tex. 1996); *see Tenet Hosps.*

*Ltd. v. Barajas*, 451 S.W.3d 535, 541 (Tex. App.—El Paso 2014, no pet.). The critical inquiry is "whether the expert's expertise goes to the very matter on which he or she is to give an opinion." *Broders*, 924 S.W.2d at 153. Thus a physician may be qualified to provide an expert report even when his specialty differs from that of the defendant "if he has practical knowledge of what is usually and customarily done by other practitioners under circumstances similar to those confronting the malpractice defendant," or "if the subject matter is common to and equally recognized and developed in *all* fields of practice." *Keo v. Vu*, 76 S.W.3d 725, 732 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).[2]

In his report, Dr. Memon stated that the applicable standards of care required Dr. Mangin to be prepared to "promptly deal with" a ruptured artery and cardiac tamponade, both of which are known complications of a stent insertion, and to call for specialists such as an anesthesiologist or cardiac surgeon "as soon as any

---

[2] For example, courts of appeals have held that experts whose specialty differed from that of the defendant were qualified when the alleged breach involved: a home health care worker's failure to recognize and act upon signs of a true medical emergency, *IPH Health Care Servs., Inc. v. Ramsey*, No. 01–12–00390–CV, 2013 WL 1183307, at *10 (Tex. App.—Houston [1st Dist.] Mar. 21, 2013, no pet.) (mem. op.); general surgical practices such as preoperative and postoperative counseling and care, *Keo*, 76 S.W.3d at 733; post-operative infection, *Garza v. Keillor*, 623 S.W.2d 669, 671 (Tex. Civ. App.—Houston [1st Dist.] 1981, writ ref'd n.r.e.); and taking a medical history and giving discharge instructions, *Hersh v. Hendley*, 626 S.W.2d 151, 155 (Tex. Civ. App.—Fort Worth 1981, no writ).

problem is apparent."[3] With respect to the first of these proposed standards of care, Dr. Memon's report raised a question about whether Dr. Mangin knew how to drain a tamponade, but he did not actually offer an opinion that Dr. Mangin was unqualified to perform a stent insertion.[4] The report thus suggested that Dr. Mangin may have erred by choosing to perform a risky procedure if he was unqualified to perform it. With respect to the proposed duty to call for specialists, Dr. Memon observed that Dopamine was administered to Mr. Wendt at 3:45 am. He characterized the administration of Dopamine as "a sign" that Mr. Wendt "was in cardiac distress" and had "low blood pressure." Four minutes later, at 3:49 am, an anesthesiologist was called, but an additional 21 minutes passed before a cardiac surgeon was called at 4:10 am. Dr. Memon's report opined that if Dr.

---

[3] Dr. Memon's report also stated: "In my opinion, the accepted standards of medical care applicable to Dr. Mangin under similar circumstances involving the treatment of a patient with an acute myocardial infarction ('MI'), but who is alert and ambulatory, generally requires transfer of the patient to the cath lab for an angiography and stent insertion." However, the remainder of the report does not suggest that Dr. Mangin breached any duty relating to the "transfer of the patient to the cath lab." Dr. Mangin first encountered Mr. Wendt in the cath lab, and Dr. Memon's report contains no suggestion that Dr. Mangin caused any delay in treatment before Mr. Wendt arrived there.

[4] In this regard, the report hypothesized: "As pericardiocentesis was not performed until after the cardiac surgeon had arrived, it leaves open the question of whether Dr. Mangin knew how to drain a tamponade? And, if he was not qualified to address this possible complication, why did Dr. Mangin choose to do a procedure with that risk?" Thus, the report posed questions, but offered no answers in the form of an opinion that Dr. Mangin had breached any relevant standard of care.

11

Mangin had promptly noticed the ruptured artery, performed pericardiocentesis, and maintained blood flow to the brain, Mr. Wendt "would not have suffered the period of hypoxia that left him brain dead." The opinions in the report relating to both of these suggested standards of care implicate the qualifications required for, and the adequacy of performance of, heart surgery relating to inserting a stent and managing complications of that procedure.

We must determine whether Dr. Memon's report and curriculum vitae demonstrate that he is qualified to offer specific expert opinions despite the fact that he is neither board certified in nor actively practicing cardiology. *See* TEX. CIV. PRAC. & REM. CODE § 74.401(c). Dr. Memon is a board-certified anesthesiologist with extensive experience in anesthesiology and pain management. He is licensed in five states, has practiced in Texas since 1977, and is "familiar with the standards of care that [apply] to physicians and institutions in Texas." His report stated that he is experienced in the administration of anesthesia and intubation of patients during surgical procedures.

Dr. Memon's attached CV shows extensive education and experience in the areas of anesthesiology and pain management. He has experience with "preoperative evaluation, airway management, including placement of an Endotracheal tube ('ETube'), and administration of anesthesia to patients undergoing surgical procedures, including cardiac procedures." In addition to his

stated education and training in the field of anesthesiology, he also asserted that he is "familiar with the possible complications that can arise during treatment of an acute myocardial infarction and the remedial measures necessary if such complications arise," and that he has "substantial knowledge of the causal relationship between an anesthesiologist's and general and traumatic surgeon's failures to meet the reasonable, prudent, and accepted standards of medical care and supervision in the diagnosis, care and treatment of patients requiring ventilation and/or undergoing general anesthesia for cardiac surgical procedures under both planned and emergent conditions."

Although he asserts familiarity with standards of care for "general and traumatic surgeons," Dr. Memon does not make any assertions of expertise pertaining to a cardiologist's duties when providing cardiac care. The report also does not explain whether and how Dr. Memon's knowledge about the standards applicable to "general and traumatic surgeons" applied to the specific breaches that he attributes to Dr. Mangin. Moreover, Dr. Memon's statement that he is "familiar" with the complications that can arise during treatment for acute myocardial infarction and the treatments for such complications is vague and non-specific. In sum, the expert report does not demonstrate how Dr. Memon's knowledge, skill, experience, training, or education qualified him to render an opinion about the particular breaches of the standard of care applicable to a

cardiologist when the coronary artery was perforated during the catheterization procedure and during subsequent complications that occurred.

The report also did not establish or even assert that Dr. Mangin's alleged breaches pertained to a subject matter that is common to and equally recognized and developed in all fields of medical practice, such that no specific cardiological knowledge or experience would be required to offer a relevant opinion. *See Broders*, 924 S.W.2d at 153; *Keo*, 76 S.W.3d at 732. Whether a cardiologist who is providing cardiac care to a patient should have sought help from a cardiac surgeon necessarily would depend on what medical care the cardiologist was capable of providing. This implicates a cardiologist's judgment relative to his specialty and is not something common to and equally recognized and developed in all fields of medicine. To the extent that Dr. Memon in fact possesses knowledge as to when a cardiologist should seek assistance from a cardiac surgeon, the basis of such knowledge was not clearly articulated in his report and CV.

Both Dr. Memon's report and his CV show that he is "certified by the American Heart Association as an Advanced Cardiac Life Support Provider," and he has been "certified by the American Heart Association as a Healthcare Provider (C.P.R. and AED)." But neither the report nor the CV explain what it means for an anesthesiologist to be certified by the American Heart Association as an Advanced Cardiac Life Support Provider or Healthcare Provider or how these certifications

14

would qualify Dr. Memon to opine, as he did, that Dr. Mangin breached a standard of care by the manner in which he managed complications of the stent insertion or by the alleged delay in seeking assistance from other specialists.

The Wendts argue that Dr. Memon cannot be disqualified simply because his area of specialization differs from Dr. Mangin's, and they emphasize that his report states that he has extensive experience practicing as an anesthesiologist in cardiac cases. But as we have explained, the expert report did not demonstrate that Dr. Memon has "substantial training or experience" in cardiology or management of cardiac complications. Although Dr. Memon stated that he has provided anesthesia to patients undergoing cardiac procedures, he did not show that his "expertise goes to the very matter on which he or she is to give an opinion." *Broders*, 924 S.W.2d at 153.

Under the specific facts presented here, Dr. Memon's report is deficient because it fails to adequately link the education and experience listed on his CV, his statement that he is familiar with complications that may arise during the treatment of myocardial infarction, and his specific opinions about how Dr. Mangin's alleged errors caused Donald Wendt's death. Such logical gaps cannot be filled by inference. *See Scoresby*, 346 S.W.3d at 556 (holding that omissions from expert report may not be supplied by inference).

15

## C.    Objective good faith effort

Dr. Mangin argues that the report's deficiency in articulating Dr. Memon's qualifications means that it did not constitute an objective good faith effort to comply with the statute. As such, he contends that the court was required to grant his motion to dismiss.

While we agree the report was deficient, we are not convinced that dismissal was required on this record. The Supreme Court often has cautioned that the statutory expert report requirements exist in part "to deter frivolous claims, not to dispose of claims regardless of their merits." *Scoresby*, 346 S.W.3d at 554; *see Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013); *Loaisiga*, 379 S.W.3d at 258. Consequently, the Court has admonished trial courts to be lenient in granting 30-day extensions. *See Scoresby*, 346 S.W.3d at 554.

Here the trial court found that the report was adequate. Indeed the report summarizes Dr. Memon's opinions on the applicable standards of care, identifies the ways in which he believes that Dr. Mangin breached those standards, and provides an explanation of how these alleged breaches caused Donald Wendt's death. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6). Accordingly, we conclude that the report was an objective good faith effort to comply, despite its deficiency in failing to articulate how Dr. Memon's expertise qualified him to render an opinion relevant to the claims against Dr. Mangin.

16

We have reached this conclusion on interlocutory appeal from the trial court's denial of the defendant's motion to dismiss. Because we have found deficient a report that the trial court considered adequate, on remand the Wendts should be afforded a 30-day extension to cure the deficiency, if possible. *See Leland*, 257 S.W.3d at 207. We sustain Dr. Mangin's first issue, and we reverse the trial court's order denying his motion to dismiss.

## II.    Zbigniew Wojciechowski, M.D.

In one issue, Dr. Wojciechowski argued that the trial court erred by denying his motion to dismiss because the reports were so deficient as to constitute no report as to him. In particular, he contends that he was not the anesthesiologist who improperly intubated Mr. Wendt. He argues that he cared for Mr. Wendt only in the operating room, and none of the expert reports implicate anything he did. He also argues that two of the reports do not mention him by name and the third report establishes that he is the wrong party.

## A.    Dr. Memon's report

Dr. Memon's report is the one that Dr. Wojciechowski contends exonerates him. Dr. Memon stated that Mr. Wendt was without oxygen for "significant periods of time," and he identified improper placement of the endotracheal tube as a contributing cause for the loss of oxygen. The report noted that "Dr. Mangin's record states that the anesthesiologist incorrectly placed the [endotracheal tube] in

17

the esophagus . . . and does not mention how long it took Dr. Smith[1] to notice and correct the placement." In the footnote referenced immediately after the name "Dr. Smith," Dr. Memon's report elaborated that the medical records were unclear as to the actual identity of the anesthesiologist who performed that procedure. He stated:

> Of note, while the records show that Dr. Wojciechowski was the anesthesiologist of record during cardiac surgery performed in the operating room and was present for the administration of general anesthesia and throughout that treatment on the morning of February 7, 2012, the nurse's notes from the catheterization lab reference that Dr. Smith had arrived, intubation was attempted, and Dr. Smith was to complete the notes on intubation. While the signature on the handwritten anesthesiology report is difficult, if not illegible, it is logical that it was prepared by the Dr. Smith who was called to the cath lab by Dr. Mangin and who performed the procedures prior to Donald Wendt's transfer to the operating room. Further, if an anesthesiologist was not present at the time of the initial intubation attempt, that of itself could be a serious departure from the standard of care and shift liability on the doctor who proceeded before the anesthesiologist was present.

Dr. Wojciechowski asserts that this shows that he was not the anesthesiologist who performed the intubation. But Dr. Memon's report is not conclusive on the issue of the relevant anesthesiologist's identity. Dr. Memon referenced "Dr. Smith" as the doctor who performed the intubation procedure, although that identification was expressly qualified by the footnoted explanation that he was drawing an inference about identity based on the sparse and partially illegible information in the record.

18

**B.     Dr. Mazzei's report**

Dr. Wojciechowski also argues that Dr. Mazzei's report is "no report" as to him because it does not mention him by name. Dr. Mazzei's report summarized relevant medical records, identified standards of care applicable to an anesthesiologist, asserted that the anesthesia provider departed from those standards of care, and explained how those departures caused Mr. Wendt's death.

When a health care liability claim is based on an assertion of direct liability, the expert report typically will identify the defendant by name. *See Mem'l Hermann Surgery Ctr. Tex. Med. Ctr., L.L.P. v. Smith*, No. 01-12-00393-CV, 2012 WL 6645017, at *4 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd). However, the statute does not specifically require the defendant physician to be identified by name, *see* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6), and in some circumstances Texas courts have held that the mere omission of a defendant's name from an expert report did not render it "no report." *See, e.g.*, *Gardner v. U.S. Imaging, Inc.*, 274 S.W.3d 669, 671–72 (Tex. 2008) (when a party's alleged liability is vicarious, a report that implicates the conduct of a defendant or its employees is adequate); *Ogletree v. Matthews*, 262 S.W.3d 316, 317, 321–22 (Tex. 2007) (report implicated defendant doctor's conduct "although it did not mention him by name"); *Troeger v. Myklebust*, 274 S.W.3d 104, 106, 110 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (expert report implicated conduct of sole

19

defendant who was not identified by name but by position as "previous dentist" and by reference to specific conduct).

Dr. Mazzei's report set forth the standards of care, breach, and causation with respect to the anesthesiologist who intubated Mr. Wendt. It recited that Dr. Mazzei is a board-certified anesthesiologist who frequently provides anesthesia for patients undergoing cardiac catheterization and who is "thoroughly familiar with ventilation problems that may arise in the course of an emergency." Dr. Mazzei reviewed Mr. Wendt's medical records and summarized them in his report. He set forth several standards of care for anesthesiologists caring for patients like Mr. Wendt. He wrote:

> When a patient requires emergency airway management as Mr. Wendt did, the standard of care requires that the anesthesiologist quickly assess the patient's condition, perform an evaluation of the airway, and bring the necessary and potentially needed equipment and drugs to ventilate and intubate the patient.

Dr. Mazzei explained that because of the bleeding from the perforation in Mr. Wendt's coronary artery, "the standard of care required that [he] be immediately intubated." He opined that this should be done under anesthesia to simplify visualization of the airway. He explained that because the paralysis from anesthesia would leave a patient unable to breathe on his own, "the standard of care requires that a patient receive 100% oxygen for several minutes prior to induction of anesthesia." In addition, "the standard of care requires that the

anesthesiologist maintain the patient's oxygen level at a sufficiently high level so as to prevent organ damage."

Dr. Mazzei explained that the medical records showed proper preoxygenation and induction of anesthesia, but "the anesthesia provider was unable to intubate . . . and during those attempts the [oxygen] saturation fell to 88%." When the "anesthesia provider" attempted mask ventilation, Mr. Wendt's oxygen saturation "fell into the 70s, a level at which organ damage starts to occur." Dr. Mazzei opined that it was this low oxygen saturation that caused Mr. Wendt to experience cardiac arrest. He further opined that the low saturations were caused by inadequate ventilation, which in turn was caused by the anesthesia provider's taking "too much time to re-establish adequate ventilation." Dr. Mazzei wrote, "This was below the standard of care and led to Mr. Wendt's anoxic brain damage and subsequent demise." Dr. Mazzei summarized his conclusions, saying that the anesthesia provider:

> induced anesthesia which stopped Mr. Wendt from breathing on his own, but then failed to re-establish sufficient ventilation before a cardiac arrest occurred. This failure was below the standard of care and was the proximate cause of the cardiac arrest that led to anoxic brain damage and ultimate demise.

Dr. Mazzei's report satisfied the statutory requirements for an expert report by setting forth the applicable standards of care, identifying how the anesthesia provider breached those standards, and explaining how the alleged breaches caused

21

Mr. Wendt's death. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6). In addition, the report and CV showed that Dr. Mazzei was qualified to render such an opinion. Although this report did not specifically identify Dr. Wojciechowski by name, it identified with particularity the responsible party by function: the anesthesia provider who intubated Mr. Wendt. *See Ogletree*, 262 S.W.3d at 321–22 (report implicated an unnamed doctor when directed solely to the care performed by the doctor); *Troeger*, 274 S.W.3d at 106, 110 (reference to "previous dentist" implicated sole defendant such as to require an objection to the adequacy of the report); *Maris v. Hendricks*, 262 S.W.3d 379, 384–85 (Tex. App.—Fort Worth 2008, pet. denied) (expert report sufficiently implicated conduct of physician's assistant who was not identified by name to constitute good-faith effort to comply with the statute).

Dr. Wojciechowski relies on several precedents from intermediate courts of appeals to support his argument that the reports did not implicate his conduct because he was not identified "by name or otherwise." In each of these cases, however, the absence of the defendant's name was not the sole reason for finding that his or her conduct was not implicated by the report.[5] Moreover, the reports in

---

[5] *See Haskell v. Seven Acres Jewish Senior Care Servs., Inc.*, 363 S.W.3d 754, 760–61 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (nurse's conduct was not implicated by report that did not mention her by name and wholly failed to address any way in which she breached the standards of care or caused the alleged injury); *Rivenes v. Holden*, 257 S.W.3d 332, 338 (Tex. App.—

22

this case constituted a good faith effort to comply with the statute because they informed Dr. Wojciechowski of the specific conduct the plaintiffs called into question and provided a basis for the trial court to conclude that their claims had merit. *E.g.*, *Potts*, 392 S.W.3d at 630.

The requirement to serve an expert report arises at the outset of litigation and before the opportunity for the plaintiff to engage in significant discovery, including taking oral depositions of the defendants. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(a) (report must be served no later than 120 days after the defendant's answer is filed); *id.* §74.351(s) (limiting discovery until after claimant serves the expert report). As such, the statute itself contemplates that the amount and quality of evidence available at the time of drafting the expert reports will be less than that available at trial on the merits or even the summary-judgment stage. *Cf. Wright*, 79 S.W.3d at 52 (the report "need not marshal all the plaintiff's proof"); *Palacios*, 46 S.W.3d at 878.

---

Houston [14th Dist.] 2008, pet. ref'd) (expert report specifically referred to codefendants but did not refer to appellant by name or by position and included only vague references to conduct of "hospital staff"); *Laredo Tex. Hosp. Co. v. Gonzalez*, 363 S.W.3d 255, 258–59 (Tex. App.—San Antonio 2012, no pet.) (expert report did not identify any defendant by name and failed to assert that anyone did anything wrong); *Velandia v. Contreras*, 359 S.W.3d 674, 678–79 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (expert report did not indicate that anyone did anything wrong); *Apodaca v. Russo*, 228 S.W.3d 252, 258 (Tex. App.—Austin 2007, no pet.) (expert report specifically identified doctor who was not sued but did not identify the sole defendant).

The alleged deficiency of which Dr. Wojciechowski complains arises from a question of fact presented by the medical records themselves: who was the doctor who performed the intubation? In reliance on those records, the expert reports in this case acknowledge and explain the factual ambiguity as to the identity of the anesthesiologist, but they do not attempt to resolve it. For example, Dr. Memon's report explains that Dr. Wojciechowski is listed as the anesthesiologist of record but states that other facts in the records suggested a "Dr. Smith" was the person who performed the intubation in the catheterization lab. But the reports do identify the anesthesia provider by function and explain how that doctor's negligence contributed to Mr. Wendt's death.

This factual ambiguity about the identity of the anesthesiologist does not affect our conclusion that the reports satisfied the statutory requirements, or in any event, constituted an objective good faith effort to comply. A trial court is required to grant a motion to dismiss only when "the report does not represent an objective good faith effort to comply." TEX. CIV. PRAC. & REM. CODE § 74.351(*l*). In light of the standard of review, we cannot conclude that the court abused its discretion by denying Dr. Wojciechowski's motion to dismiss.

Moreover, in their briefing on interlocutory appeal the parties have suggested that further discovery has led to a resolution of the factual ambiguity regarding the identity of the responsible anesthesiologist. Because this is an

24

interlocutory appeal, our disposition of this case does not end the litigation but instead returns the parties to the district court to proceed to trial on the merits or avail themselves of other procedural avenues for seeking dismissal if there is evidence conclusively showing that the wrong party has been sued. *See, e.g.*, TEX. R. CIV. P. 166a.

We hold that the trial court did not err by denying Dr. Wojciechowski's motion to dismiss, and we overrule his sole issue.

### Conclusion

We reverse the trial court's denial of Dr. Mangin's motion to dismiss, and we remand to the trial court to afford the Wendts a 30-day extension to cure the deficiency as set forth in this opinion and for further proceedings. We affirm the trial court's denial of Dr. Wojciechowski's motion to dismiss, and we remand to the trial court for further proceedings.

 

Michael Massengale
Justice

Panel consists of Justices Keyes, Bland, and Massengale.

Justice Keyes, dissenting.