Opinion issued August 23, 2018



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-17-00742-CV

_____

**NANCY CARMEN CURNEL AND RONALD CURNEL, Appellants**

**V.**

**THE METHODIST HOSPITAL, TMH HEALTH CARE GROUP, OBIOHA EMENANJO, R.N., LIQUN JIANG, R.N., AND MOSHIR BANSUAN, R.N., Appellees**

---

On Appeal from the 55th District Court
Harris County, Texas
Trial Court Case No. 2016-36453

---

## MEMORANDUM OPINION

This is an interlocutory appeal from the trial court's order dismissing health care liability claims for failure to serve adequate expert reports. *See* TEX. CIV. PRAC. & REM. CODE §§ 51.014(a)(9), 74.351(a), (b).

Nancy Curnel presented to the emergency room of Houston Methodist Hospital-Willowbrook ("Willowbrook") with elevated liver enzymes caused by a recently prescribed antibiotic. Curnel was examined by a hospitalist, who, without evaluating her current medications for hepatotoxicity, misdiagnosed her with viral hepatitis, ordered that she continue taking the antibiotic, and admitted her to the hospital. Once admitted, Curnel underwent further testing, but none of the physicians or nurses evaluated her medications for hepatotoxicity. As a result, she continued to receive the hepatotoxic antibiotic.

On the third day of her hospitalization, Curnel was examined by a gastroenterologist, who noted that she might be suffering from drug-induced liver injury but also ordered a biopsy of her liver to test for other potential causes. Later that same day, another hospitalist discontinued the antibiotic, and Curnel's liver enzymes began to improve. Despite the improvement, none of Curnel's physicians cancelled or postponed the biopsy. On the morning of the fifth day of Curnel's hospitalization, a radiologist performed the biopsy as scheduled. During the biopsy, the radiologist nicked Curnel's artery, causing her severe injuries.

Curnel and her husband, Ronald, asserted health care liability claims against the various physicians who treated her throughout her hospitalization. The Curnels also asserted two health care liability claims against Willowbrook. The first was a direct liability claim based on Willowbrook's alleged failure to have in place

policies and procedures to ensure all medications at Willowbrook were safely prescribed and administered. The second was a vicarious liability claim based on the Willowbrook nursing staff's failure to evaluate Curnel's medications for hepatotoxicity, refrain from administering the antibiotic, and inform the prescribing hospitalist of the antibiotic's hepatotoxicity.

The Curnels served a series of expert reports from a registered nurse, Julie Fomenko, and a gastroenterologist, Dr. Todd Sheer. Fomenko's reports addressed the standard of care and breach, while Sheer's reports addressed causation. Willowbrook filed a motion to dismiss. The trial court found that the combined expert reports were deficient on all three elements, denied the Curnels' request for an extension to cure the deficiencies, and dismissed the Curnels' claims against Willowbrook with prejudice. The Curnels appealed the trial court's interlocutory order dismissing their claims against Willowbrook.

After they filed their appeal, the Curnels filed an amended petition, which asserted health care liability claims against the Methodist Hospital System ("Methodist System"), which manages and oversees Willowbrook, as well as three Willowbrook nurses, Moshir Bansuan, Obioha Emenanjo, and Liqun Jiang (the "Nurse Defendants"). The Curnels' claim against Methodist System was based on the same allegations as their direct liability claim against Willowbrook, and their

3

claims against the Nurse Defendants were based on the same allegations as their vicarious liability claim against Willowbrook.

The Curnels served another series of expert reports from Fomenko and Sheer, and Methodist System and the Nurse Defendants filed motions to dismiss. Like the expert reports on Willowbrook, the trial court found the expert reports on Methodist System and the Nurse Defendants deficient on all three elements. The trial court denied the Curnels' request for an extension to cure and dismissed their claims with prejudice. The Curnels then filed this second interlocutory appeal, in which they raised substantially similar issues as the first, contending that the trial court abused its discretion by (1) granting the motions to dismiss and (2) denying their motion for an extension to cure.

During the pendency of this second appeal, another panel of this court issued an opinion resolving the first appeal, *Curnel v. Houston Methodist Hosp.-Willowbrook*, No. 01-17-00088-CV, 2018 WL _____ (Tex. App.—Houston [1st Dist.] Aug. 16, 2018, no pet. h.) ("*Curnel I*"). There, the court held that Fomenko's reports on Willowbrook provided adequate opinions on the standard of care and breach but that Sheer's reports on Willowbrook did not provide an adequate opinion on either component of proximate cause. *Id.* at *__. The court further held, however, that these deficiencies might be curable and that the trial court therefore abused its discretion in denying the Curnels' motion for an extension to cure. *Id.* at

4

\*__. Accordingly, the court reversed the trial court's order and remanded the case for further proceedings. *Id.* at \*__.

Applying the reasoning from *Curnel I* here, we hold that the expert reports on Methodist System and the Nurse Defendants were deficient but potentially curable. Therefore, we reverse the trial court's order dismissing the Curnels' claims against Methodist System and the Nurse Defendants and remand the case for further proceedings.

## Factual Background

The following is a summary of the factual background, which is based on the expert reports of Sheer and Fomenko and is more thoroughly set out in *Curnel I. See id.* at \*__–__. We accept the expert reports' factual statements for the limited purpose of this appeal. *See Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam) (review of Chapter 74 report is limited to four corners of report).

### *Curnel is prescribed an antibiotic that can cause elevated liver enzymes*

On October 4, 2015, Nancy Curnel presented to a local walk-in clinic, where she was diagnosed with a urinary tract infection and prescribed the antibiotic nitrofurantoin. Nitrofurantoin is known for potential hepatotoxic effects and can cause drug-induced liver injury (DILI).

5

*Curnel presents to the Willowbrook ER with elevated liver enzymes*

Four days later, on October 8, 2015, Curnel presented to Willowbrook's emergency room. Curnel said that she had been sent to the ER by her primary care physician because recent blood work indicated that she had elevated liver enzymes.

Curnel was examined by an emergency medicine physician, Dr. Scott Wiesenborn, who noted that Curnel had recently begun taking nitrofurantoin and had been referred to the ER for elevated liver enzymes. Wiesenborn diagnosed Curnel with acute hepatitis without specifying a cause. There is no documentation that Wiesenborn or the ER nurses evaluated Curnel's current medications for hepatotoxic potential or otherwise considered nitrofurantoin as a potential cause of Curnel's elevated liver enzymes.

*Curnel is hospitalized*

Wiesenborn called the on-duty hospitalist, Dr. Michael Esantsi, to determine whether to admit Curnel for hospitalization. During his examination, Esantsi noted that Curnel had recently begun taking nitrofurantoin, but he did not order that the medication be evaluated for hepatotoxic potential or note it as a potential cause of Curnel's elevated liver enzymes. Instead, he diagnosed Curnel with probable viral hepatitis; admitted her to the hospital; ordered that she continue taking her current medications, including, specifically, nitrofurantoin; and ordered a gastroenterology consultation.

6

That afternoon, Curnel was examined by a gastroenterologist, Dr. Steven Ugbarugba. Ugbarugba performed a number of tests, which ruled out a number of potential causes of Curnel's elevated liver enzymes. However, like the nurses and physicians before him, Ugbarugba did not evaluate any of Curnel's medications for hepatotoxic potential or note nitrofurantoin as a potential cause of Curnel's elevated liver enzymes. Later that evening, Curnel received nitrofurantoin from one of the nurses, Moshir Bansuan.

On the morning of October 9, Curnel's liver enzymes were tested again. The test results showed that her already abnormally high enzymes had risen even further. She underwent additional testing, which indicated that she did not have viral hepatitis but was suffering from DILI instead. Nevertheless, when Esantsi saw her again that day, he continued to diagnose her with probable viral hepatitis. There is no indication that Curnel's medications were considered as a potential cause of her elevated liver enzymes during that evaluation. That evening, Curnel received nitrofurantoin from another nurse, Obioha Emenanjo.

On the morning of October 10, Curnel received nitrofurantoin from a third nurse, Liqun Jiang. Later that day, she was examined again by Dr. Ugbarugba, who noted that the cause of her elevated liver enzymes remained unclear and that she might be suffering from DILI. Ugbarugba ordered that Curnel discontinue all

7

hepatotoxic medications (without specifically ordering that she discontinue nitrofurantoin) and that she undergo a liver biopsy.

Curnel was then examined by another hospitalist, Dr. Yamini Naygandhi, who ordered a review of Curnel's medications to "find out" what was "causing" her "elevated" liver enzymes. She further ordered that Curnel discontinue nitrofurantoin. Curnel did not receive nitrofurantoin that evening or the following day, and her liver enzymes began to improve.

### Curnel's artery is nicked during her liver biopsy

On the morning of October 12, before her scheduled biopsy, Curnel's liver enzymes showed "further improvement." A pre-biopsy blood clotting test ordered by Esantsi returned as normal. Curnel was examined for a third time by Ugbarugba, who noted that her biopsy would take place later that day. An hour and a half later, a radiologist, Dr. Mark Brodie, performed the biopsy and nicked Curnel's artery, causing severe injuries.

## Procedural History

The Curnels asserted a health care liability claim against Esantsi, and they asserted two health care liability claims against Willowbrook—a direct liability claim based on Willowbrook's allegedly inadequate policies and procedures and a vicarious liability claim based on the alleged negligence of the Willowbrook nursing staff. The trial court found that the combined expert reports of Sheer and

8

Fomenko were deficient as to both Esantsi and Willowbrook and dismissed the Curnels' claims against them with prejudice. The Curnels filed an interlocutory appeal of the trial court's order dismissing their claims against Esantsi and Willowbrook. *See id.* at * __.

While the *Curnel I* interlocutory appeal was pending, the Curnels filed an amended petition, which asserted health care liability claims against Methodist System and the Nurse Defendants. The Curnels' claim against Methodist System was based on the same allegations as their direct liability claim against Willowbrook, and their claims against the Nurse Defendants were based on the same allegations as their vicarious liability claim against Willowbrook.

The Curnels served Methodist System and the Nurse Defendants with six expert reports, three from Sheer and three from Fomenko. Methodist System and the Nurse Defendants objected that the reports were inadequate as to all three elements of the Curnels' claims (standard of care, breach, and causation), objected that Fomenko and Sheer were not qualified to offer opinions on standard of care or breach for Methodist System, and moved to dismiss the Curnels' claims. The Curnels filed a response, which requested a 30-day extension to cure the expert reports in the event the trial court found them deficient.

The trial court found the reports deficient, denied the Curnels' motion for an extension to cure, and dismissed their claims against Methodist System and the

Nurse Defendants. The Curnels filed this second interlocutory appeal of the trial court's order dismissing their claims against Methodist System and the Nurse Defendants. While this interlocutory appeal was pending, the court issued *Curnel I*, which held that the expert reports on Willowbrook were deficient but potentially curable, reversed the trial court's order, and remanded the case for further proceedings. *Id.* at *__.

## Motion to Dismiss

In their first issue, the Curnels contend that the trial court abused its discretion by dismissing their claims against Methodist System and the Nurse Defendants for failure to serve adequate expert reports.

### A.   Applicable law and standard of review

Under the Medical Liability Act, a plaintiff asserting health care liability claims must timely serve each defendant physician and health care provider with one or more expert reports and a curriculum vitae of each expert whose opinion is offered to substantiate the merits of the claims. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (i); *see Mangin v. Wendt*, 480 S.W.3d 701, 705 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The expert report must provide a "fair summary" of the expert's opinions regarding the (1) applicable standards of care, (2) manner in which the care rendered by the physician or health care provider failed to meet the standards, and (3) causal relationship between that failure and

the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6).

For standard of care and breach, the expert report must explain what the physician or health care provider should have done under the circumstances and what the physician or health care provider did instead. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001). For causation, the expert report must explain how and why the physician's or health care provider's breach proximately caused the plaintiff's injury. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017).

When the plaintiff timely serves an expert report, and the defendant timely files a motion to dismiss to challenge the adequacy of the report, the trial court may take one of three actions. *Mangin*, 480 S.W.3d at 705. First, if the trial court concludes that the report is adequate, it must deny the motion. *Id.* Second, if the trial court concludes that the report does not constitute an objective good faith effort to comply with the statute, it must grant the motion. *Id.*; *see* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*). Third, if the trial court concludes that the report is an objective good faith effort to comply with the statute but is nevertheless deficient in some way, it may grant the plaintiff one 30-day extension to cure the deficiency and must grant the extension if the deficiency is curable. *Mangin*, 480 S.W.3d at 705–06.

11

A report qualifies as an objective good faith effort to comply if it discusses each element with sufficient specificity that it (1) informs the defendant of the specific conduct the plaintiff questions and (2) provides a basis for the trial court to conclude that the plaintiff's claims have merit. *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018); *Mangin*, 480 S.W.3d at 706. In determining whether an expert report constitutes an objective good faith effort to address each element, "a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report." *Cornejo v. Hilgers*, 446 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *see Baty*, 543 S.W.3d at 693. And when the issue is the expert's qualifications, the court may also consider the four corners of the expert's curriculum vitae. *Mangin*, 480 S.W.3d at 706.

We review a trial court's ruling on a motion to dismiss a healthcare liability claim for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam). We "defer to the trial court's factual determinations if they are supported by evidence, but review its legal determinations de novo." *Id.* "A trial court abuses its discretion if it rules without reference to guiding rules or principles." *Id.*

**B.      Methodist System**

The Curnels supported their claim against Methodist System with expert reports from Fomenko and Sheer. Fomenko's reports provide opinions on the standard of care and breach, while Sheer's reports provide an opinion on causation.

**1.      Fomenko's qualifications**

The trial court generally sustained Methodist System's objections, including its objection that Fomenko is not qualified to provide opinions on the standards of care applicable to Methodist System or the manner in which Methodist System breached those standards.[1] We therefore begin our analysis by considering whether Fomenko was qualified to provide an opinion on these two elements.

Under the statute, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:

> (1)   is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, if the defendant health care provider is an individual, at the time the testimony is given or was practicing that type of health care at the time the claim arose;

---

[1]   The trial court also sustained Methodist System's objection that Sheer is not qualified to render an opinion on the applicable standard of care for Methodist System. On appeal, the Curnels' do not challenge this ruling.

13

(2)     has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and

(3)     is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.

TEX. CIV. PRAC. & REM. CODE § 74.402(b).

Methodist System contends that Fomenko fails to satisfy the second and third prongs of this test. We disagree.

Fomenko opines that the standard of care required Methodist System to develop and implement policies and procedures requiring the Willowbrook nursing and pharmacy staff to promptly (1) evaluate all patient medications for toxicity and (2) report the results of such evaluations to the patients' physicians. Fomenko's CV and reports establish her qualifications to offer these opinions.

Fomenko's CV lists her relevant education, professional experience, and professional memberships. Under education, Fomenko's CV states that she has undergraduate and graduate degrees in nursing and that she is currently working on her PhD. Under professional experience, Fomenko's CV lists fifteen positions she has held over her thirty-plus year career as a registered nurse. Fomenko's CV states that Fomenko currently serves as Clinical Assistant Professor of Nursing at Texas A&M University—Corpus Christi, where she teaches Critical Care Nursing, Medical-Surgical Nursing, and Professional Transitions. Before she began

14

teaching, Fomenko was the Chief Clinical Officer of a hospital in Corpus Christi. And before that, she held a variety of other positions at numerous other hospitals and clinics. Under professional memberships, Fomenko's CV states that she is a member of the International Association of Clinical Simulation & Learning, Texas Nurses Association, and American Nurses Association, among other organizations.

In her reports, Fomenko explains her professional experience:

> I have taught pharmacology and safety in medication delivery to nurses and hospital management personnel. I have more than 30 years of clinical experience and have held clinical, management, and supervisory positions in a variety of inpatient and outpatient hospital settings and at many administrative levels. I have participated in management committees, as well as worked in a great variety of specialty practice areas (critical care, emergency room, general nursing units, cardiac catheterization and invasive laboratories, and in private medical practice). I also hold academic qualifications in nursing management including a Master's degree in Nursing Leadership and Management from Walden University. I have extensive experience in the development of policies and procedures, evaluating competency of nursing staff, and methods for improving and ensuring clinical competence of hospital staff. I am directly involved in the educations of clinicians, evaluation and management of their educational practices and learning methods . . . .

Thus, Fomenko's CV and reports establish that she has knowledge of the accepted standards of care for a hospital system and experience in the administrative aspects of a hospital system, at least with respect to how a hospital system should regulate its nursing staff's evaluation and administration of patient medication. We hold that, based on the four corners of Fomenko's CV and her

expert report, Fomenko is qualified to offer opinions on Methodist System's applicable standard of care and breach.

**2.    Fomenko's opinions on elements of standard of care and breach**

Next, we consider whether Fomenko's reports provide adequate opinions on the first two elements: standard of care and breach. In her reports, Fomenko opines that the standard of care required Methodist System to develop and implement policies and procedures that required the Willowbrook nursing and pharmacy staff to promptly (1) evaluate all patient medications for toxicity and (2) report the results of such medication evaluations to the patients' physicians. According to Fomenko, such policies and procedures should require an evaluation of medications when the patient presents to the hospital, when the patient is admitted to the hospital, and, once admitted, when the patient is prescribed and administered medication.

Fomenko explains that she reviewed Willowbrook's nursing and pharmacy policies and procedures and did not find any policies and procedures providing for the routine evaluation of patient medications or the timely delivery of the results of such evaluations to physicians and other clinicians. Fomenko further explains that, even if such policies and procedures existed, the Willowbrook nursing and pharmacy staff failed to follow them, as evidenced by the fact that Curnel's medications were not evaluated for hepatotoxicity when she was admitted to the

hospital or before the nurses administered nitrofurantoin to her for three consecutive days. Thus, Fomenko opines that Methodist System breached the applicable standard of care because policies and procedures for medication evaluation were either not in place or not enforced. According to Fomenko, Methodist System "chose to rely on random compliance of the individual physician, nurse, [and] pharmacist" and assumed that they would "'just know' the medication effects before prescribing and administering a drug."

These opinions are substantially similar to the opinions Fomenko provided in her reports on the Curnels' direct liability claim against Willowbrook, the adequacy of which were addressed in *Curnel I*. 2018 WL _____, at *__. Applying the reasoning from *Curnel I* here, we hold that Fomenko's reports on Methodist System explain what she believes the standard of care required Methodist System to have done under the circumstances and what it did instead. *See Palacios*, 46 S.W.3d at 880. We hold that Fomenko's expert reports provide adequate opinions on the standard of care applicable to Methodist System and the manner in which the care rendered by Methodist System failed to meet that standard. *See Curnel I*, 2018 WL _____, at *__.

### 3. Sheer's opinion on element of causation

Next, we consider whether Sheer's reports provide an adequate opinion on the element he addresses: causation. In his reports, Sheer opines that the breach of

17

standard of care identified by Fomenko—i.e., Methodist System's failure to develop and implement policies and procedures relating to the evaluation of medication—proximately caused Curnel's injuries. According to Sheer, had such policies and procedures been in place, the Willowbrook nursing and pharmacy staff would have evaluated Curnel's medications and informed her physicians that nitrofurantoin is hepatotoxic, and Curnel's physicians, in turn, would have ordered that she discontinue the antibiotic. Curnel's liver enzymes would have begun to improve, and her physicians would have then diagnosed her with DILI, discharged her from the hospital, and referred her to her primary care provider for continued outpatient monitoring. And, as a result, Curnel would have avoided the unnecessary liver biopsy that caused her severe injuries.

Again, this opinion is substantially similar to the opinion Sheer provided in his reports on the Curnels' direct liability claim against Willowbrook, the adequacy of which was addressed in *Curnel I. Id.* at \*__. Like his reports on Willowbrook, Sheer's reports on Methodist System attempt to show proximate cause by explaining a chain of events that begins with Methodist System's failure to implement and enforce certain policies and procedures and ends with Curnel's artery being nicked during the unwarranted liver biopsy. The *Curnel I* opinion held that Sheer's reports failed to adequately address cause-in-fact because the reports did not explain how and why the liver biopsy would have been avoided had the

18

policies and procedures been in place given that Curnel's physicians did what the policies and procedures were meant to accomplish—evaluate Curnel's medications for hepatotoxicity, recognize DILI as a potential cause of her elevated liver enzymes, and discontinue nitrofurantoin—but proceeded with the biopsy anyway. *Id.* at * __. And Sheer's reports were held to have failed to adequately address foreseeability because the reports did not explain how and why Willowbrook should have anticipated that its failure to implement the policies and procedures would result in Curnel's artery being nicked during the biopsy of her liver. *Id.* at *__. Applying that reasoning here, we hold that Sheer's reports on Methodist System fail to adequately address both components of proximate cause.

## C.    The Nurse Defendants

The Curnels supported their claims against the Nurse Defendants with expert reports from Fomenko and Sheer. Once again, Fomenko's reports address the standard of care and breach, while Sheer's reports address causation. Thus, we begin our analysis by considering whether Fomenko's reports provide adequate opinions on the first two elements: standard of care and breach.

### 1.    Fomenko's opinions on elements of standard of care and breach

In her reports, Fomenko opines that the standard of care required the Nurse Defendants to (1) evaluate Curnel's medications, (2) recognize that nitrofurantoin was hepatotoxic and thus contraindicated given Curnel's elevated liver enzymes,

19

(3) refrain from administering nitrofurantoin to Curnel, (4) notify the ordering practitioner, Dr. Esantsi, of the reason for their decision, and (5) seek clarification of Dr. Esantsi's order. Fomenko stated that her opinion was supported, in part, by Section 217.11 of the Texas Administrative Code, which sets forth "standards of practice" for nurses practicing within the State. 22 TEX. ADMIN. CODE § 217.11(1)(A)–(D).

Fomenko further opines that the Nurse Defendants breached the standard of care by failing to take any of the steps listed above. They failed to evaluate the hepatotoxic potential of Curnel's medications when she presented to the ER or when she was admitted to the hospital, and they failed to document the need to perform such an evaluation in Curnel's plan of care. They noted Curnel had been taking nitrofurantoin, but they failed to recognize that nitrofurantoin is hepatotoxic and thus failed to clarify the contraindicated nitrofurantoin order with Esantsi or another practitioner. And instead of holding the medication, they administered it to Curnel for three additional days.

Again, these are component parts of the opinions Fomenko provided in her reports on the Curnels' vicarious liability claim against Willowbrook, the adequacy of which were addressed in *Curnel I*. 2018 WL _____, at *__. Applying that reasoning here, we hold that Fomenko's reports on the Nurse Defendants explain what she believes the standard of care required the Nurse Defendants to have done

20

under the circumstances and what they did instead. *Id.* at *__. We hold that Fomenko's expert reports provide adequate opinions on the standard of care applicable to the Nurse Defendants and the manner in which the care they rendered breached that standard. *Id.* at *__.

### 2. Sheer's opinion on element of causation

Next, we consider whether Sheer's reports provide an adequate opinion on the element he addresses: causation. In his reports, Sheer opines that, by failing to promptly evaluate Curnel's medications and instead administering the contraindicated antibiotic for three additional days, the Nurse Defendants "perpetuated Mrs. Curnel's elevated liver values and the physicians' drive for further workup." According to Sheer, had the Nurse Defendants complied with the standard of care identified by Fomenko, the physicians would have had the benefit of data showing a declining trend in Curnel's liver enzymes, which, in turn, would have led them to diagnose her with DILI and discharge her for further monitoring on an outpatient basis, thereby avoiding the liver biopsy and the injuries that resulted from it.

Again, Sheer provided this opinion as part of his reports on the Curnels' vicarious liability claim against Willowbrook. *Id.* at * __. Like his reports on Willowbrook's nursing staff, Sheer's reports on the Nurse Defendants attempt to show proximate cause by explaining a chain of events that begins with the Nurse

Defendants' failure to evaluate Curnel's medications and refrain from administering the contraindicated nitrofurantoin and ends with Curnel's artery being nicked and the resulting injuries. *Curnel I* held that Sheer's reports failed to adequately address cause-in-fact because the reports did not (1) explain how and why the nurses' failure to evaluate Curnel's medications and refrain from administering nitrofurantoin caused the biopsy and resulting injuries when the physicians themselves evaluated Curnel's medications and discontinued nitrofurantoin without cancelling or postponing the biopsy, (2) explain how the nurses "had either the right or the means to persuade" the physicians to cancel the biopsy, *Zamarripa*, 526 S.W.3d at 461, or (3) state that the nurses were part of the decision to perform the biopsy or its timing. *Id.* at *__. Sheer's reports were also held to have failed to adequately address foreseeability because the reports did not explain how and why the nurses should have anticipated that their negligent failure to evaluate Curnel's medications and to refrain from administering the drug would result in Curnel's artery being nicked during a biopsy of her liver. For these same reasons, we hold that Sheer's reports on the Nurse Defendants fail to adequately address causation.

* * *

In sum, we hold that Fomenko is qualified to offer an opinion on Methodist System and that her reports on Methodist System provide adequate opinions on the

22

standard of care and breach but that Sheer's reports on Methodist System do not provide adequate opinions on either component of proximate cause. Likewise, we hold that Fomenko's reports on the Nurse Defendants provide adequate opinions on the standard of care and breach but that Sheer's reports on the Nurse Defendants do not provide adequate opinions on either component of proximate cause. Therefore, the trial court did not abuse its discretion in finding the reports inadequate as to both Methodist System and the Nurse Defendants. Accordingly, we overrule the Curnels' first issue.

**Motion for Extension to Cure**

In their second issue, the Curnels contend that the trial court abused its discretion by denying their motion for a 30-day extension to cure the deficiencies in their expert reports.

Under the Act, if the plaintiff timely serves an expert report, and the trial court concludes that the report is an objective good faith effort to comply with the statute but nevertheless deficient in some way, the trial court has the discretion to grant the plaintiff one 30-day extension to cure the deficiencies. TEX. CIV. PRAC. & REM. CODE § 74.351(c); *Mangin*, 480 S.W.3d at 705–06. The trial court should err on the side of granting the extension. *Samlowski v. Wooten*, 332 S.W.3d 404, 416 (Tex. 2011) (Guzman, J., concurring) ("In order to preserve the highest number of meritorious claims, trial courts should err on the side of granting claimants'

extensions . . . ."); *see also Samlowski*, 332 S.W.3d at 411 (plurality op.) (agreeing with concurrence that trial court should err on side of granting extension). And the trial court must grant the extension if the deficiencies are curable. *Zamarripa*, 526 S.W.3d at 461.

The Texas Supreme Court established a "minimal" standard for determining whether a deficient report might qualify for an extension to cure: "a 30–day extension to cure deficiencies in an expert report may be granted if the report is served by the statutory deadline, if it contains the opinion of an individual with expertise that the claim has merit, and if the defendant's conduct is implicated." *Scoresby*, 346 S.W.3d at 557.

We review a trial court's ruling on motion for an extension to cure a deficient expert report for an abuse of discretion. *Quintero v. Hous. Methodist Hosp.*, No. 01-14-00448-CV, 2015 WL 831955, at *2 (Tex. App.—Houston [1st Dist.] Feb. 26, 2015, pet. denied) (mem. op.); *Henry v. Kelly*, 375 S.W.3d 531, 535 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

The Curnels timely served Methodist System and the Nurse Defendants with reports before the statutory deadline. Despite their deficiencies, these reports contain the opinions of qualified experts that the Curnels' claims had merit and implicated the conduct of Methodist System and the Nurse Defendants; they

qualify as objective good faith efforts to comply with the statute. *See Scoresby*, 364 S.W.3d at 557.

Despite objective good faith efforts from the Curnels, the trial court dismissed their claims without affording them an opportunity to cure their deficient reports. Part of the purpose of the extension is to afford a plaintiff who made a good faith effort the chance to cure a defective report after the deficiencies have been identified by the trial court. Given the "minimal" standard established by the Texas Supreme Court and the Curnels' objective good faith effort to serve compliant reports, we cannot say that it would have been impossible for the Curnels to have cured their reports once they were informed of the deficiencies. *See Zamarripa*, 526 S.W.3d at 461.

Moreover, when the trial court dismissed the Curnels' claims, it was unclear whether the statute required expert reports to address foreseeability, and at least two courts of appeals had held that it did not. *See Rio Grande Reg'l Hosp. v. Ayala*, No. 13-11-00686-CV, 2012 WL 3637368, at *19 (Tex. App.—Corpus Christi Aug. 24, 2012, pet. denied) (mem. op.), *abrogated by Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453 (Tex. 2017); *Adeyemi v. Guerrero*, 329 S.W.3d 241, 246 (Tex. App.—Dallas 2010, no pet.). The Texas Supreme Court resolved the issue while this appeal was pending when it issued *Zamarripa* and held that an expert report must address both cause-in-fact and

foreseeability. 526 S.W.3d at 460. Given this development, the Curnels should be afforded the opportunity to amend their reports to address foreseeability and to cure the other deficiencies identified in this opinion.

Therefore, we hold that the trial court abused its discretion in denying their motion for an extension to cure. Accordingly, we sustain the Curnels' second issue.

## Conclusion

We reverse the trial court's order and remand for further proceedings.


Harvey Brown
Justice

Panel consists of Chief Justice Radack and Justices Massengale and Brown.