Opinion issued December 31, 2019



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-01054-CV

_____

**NANCY CARMEN CURNEL AND RONALD CURNEL, Appellants**

**V.**

**HOUSTON METHODIST WILLOWBROOK HOSPITAL, THE METHODIST HOSPITAL D/B/A THE METHODIST HOSPITAL SYSTEM, OBIOHA TOBECHUKWU EMENANJO, RN, LIQUN MICHELLE JIANG, RN, AND MOSHIR SIMON BANSUAN, RN, Appellees**

---

**On Appeal from the 55th District Court**
**Harris County, Texas**
**Trial Court Case No. 2016-36453**

---

## MEMORANDUM OPINION

In this interlocutory appeal, Nancy Carmen Curnel and Ronald Curnel appeal from a judgment dismissing their health care liability claim for failure to serve adequate expert reports. TEX. CIV. PRAC. & REM. CODE §§ 51.014(a)(9),

74.351(a), (b). In a single issue, the Curnels contend that the trial court abused its discretion by granting the motion to dismiss for failure to serve adequate expert reports. We reverse and remand.

## Background

This case has been before us twice previously.[1] According to the expert reports, Nancy Curnel visited a local walk-in clinic on October 4, 2015. She was diagnosed with a urinary tract infection and prescribed the antibiotic nitrofurantoin. Nitrofurantoin is known for potential hepatotoxic effects and can cause drug-induced liver injury ("DILI").

Four days later, Curnel presented to the emergency department at Houston Methodist Willowbrook Hospital ("Willowbrook") with elevated liver enzymes. Dr. M. Esantsi, an on-duty hospitalist, examined Curnel and misdiagnosed her with viral hepatitis. Without evaluating her current medications for hepatotoxicity, Dr. Esantsi told Curnel to continue taking the antibiotic that caused her elevated liver enzymes. He then admitted her to the hospital for further evaluation. Once

---

[1] *Curnel v. Houston Methodist Hosp.-Willowbrook*, 562 S.W.3d 553 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (op. on reh'g) ("*Curnel I*") (holding the trial court abused its discretion in denying motion for extension to cure deficient expert reports and motion for reconsideration); *Curnel v. Methodist Hosp.*, No. 01-17-00742-CV, 2018 WL 4014590, at *1 (Tex. App.—Houston [1st Dist.] Aug. 23, 2018, no pet.) (mem. op.) ("*Curnel II*") (holding the trial court abused its discretion in denying their motion for an extension to cure deficient expert reports).

2

admitted, Dr. Esantsi ordered nurses to administer acetaminophen to Curnel, which is a well-known hepatoxic medication.

Shortly thereafter, two nurses administered nitrofurantoin to Curnel at separate times. On the third day of her hospitalization, Dr. S. Ugbarugba, a gastroenterologist, examined Curnel, noted that she might be suffering from DILI, and ordered a biopsy of her liver for additional testing. Dr. Ugbarugba did not record the medications that Curnel had been taking at that time, including nitrofurantoin. Dr. Y. Naygandhi, another hospitalist, examined Curnel that same day, documented the "medication-related hepatitis," and ordered a review of Curnel's medications to determine the cause of her elevated liver enzymes.

Dr. Naygandhi further ordered Curnel to discontinue nitrofurantoin, and Curnel's liver enzymes improved.[2] Her bilirubin began to decrease, her AST continued to decrease, and her ALT and ALP underwent "non-significant changes." Dr. Ugbarugba examined Curnel examined a third time. His progress note contained the "exact" same "assessment from the day prior" except that it noted, "Liver bx today."[3] "A pre-procedure prothrombin time/INR ordered by Dr. Esantsi return[ed] as normal (this was the first time checked since presentation)."[4]

---

[2]  None of the physicians specifically ordered that Curnel discontinue acetaminophen.

[3]  The medical term "Bx" is an abbreviation for biopsy. *Bx*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/bx (last visited Oct. 22, 2019).

Despite Curnel's liver enzymes showing signs of improvement after discontinuing nitrofurantoin, neither the physicians nor the nurses canceled or postponed the biopsy. A radiologist performed the biopsy. He obtained two "cores," which showed that "the liver function abnormalities were due to medication effects." During the biopsy, the radiologist nicked Curnel's artery, causing severe injuries, including shock, anemia, and intra-abdominal hemorrhage. Curnel required multiple blood transfusions, medications to maintain circulation, mechanical ventilation, prolonged resuscitation, and extended ICU care.

## Procedural History

Curnel and her husband, Ronald (the "Curnels"), asserted health care liability claims against Willowbrook, Dr. Ugbarugba, and various other physicians who treated her throughout her hospitalization. The Curnels obtained and served a series of expert reports from a gastroenterologist, Dr. T. Sheer, and a registered nurse, J. Fomenko. Dr. Sheer's report addressed whether the failure to evaluate the toxicity of Curnel's medications and whether the failure to implement a "chain of command" system caused Curnel's injuries. Fomenko's report addressed the standard of care and its breach. Willowbrook and Dr. Esantsi filed motions to dismiss under Texas Civil Practice and Remedies Code Section 74.351. The trial

---

[4]    "A prothrombin time test measures how quickly your blood clots." *Prothrombin time test*, Mayo Clinic (May 10, 2018), https://www.mayoclinic.org/tests-procedures/prothrombin-time/about/pac-20384661.

court found that the combined expert reports were inadequate as to all three elements of the Curnels' claims (i.e., standard of care, breach, and causation), denied the Curnels' request for an extension to cure the deficiencies, and dismissed the Curnels' claims against Willowbrook and Dr. Esantsi. The Curnels appealed the trial court's interlocutory order dismissing their claims with prejudice against Willowbrook, contending the trial court abused its discretion in granting the motion to dismiss for failure to serve adequate expert reports. *See Curnel v. Houston Methodist Hosp.–Willowbrook*, 562 S.W.3d 553, 561 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (op. on reh'g) ("*Curnel I*").

In *Curnel I*, this Court held Fomenko's reports on Willowbrook provided adequate opinions on the standard of care and breach but that Dr. Sheer's reports on Willowbrook did not adequately address cause-in-fact and foreseeability, as required to establish causation. *Id*. at 570. This Court also held that the expert reports were potentially curable and therefore the trial court erred in failing to allow an extension to cure deficiencies. *Id*. The case was remanded for further proceedings. *Id*.

While the *Curnel I* interlocutory appeal was pending, the Curnels filed an amended petition, which asserted health care liability claims against TMH Health Care Group, the Methodist Hospital System ("Methodist"), which manages and oversees Willowbrook, as well as three Willowbrook nurses, M. Bansuan, O.

5

Emenanjo, and L. Jiang (the "Nurse Defendants"). The Curnels' claim against Methodist was based on the same allegations as their direct liability claim against Willowbrook, and their claims against the Nurse Defendants were based on the same allegations as their vicarious liability claim against Willowbrook. The Curnels served additional expert reports. Willowbrook and the Nurse Defendants objected to the expert reports as deficient and moved to dismiss the Curnels' claims. The Curnels filed a response and requested an extension to cure the expert reports. Finding the expert reports deficient, the trial court denied the Curnels' motion for an extension to cure and dismissed their claims against Methodist and the Nurse Defendants. The Curnels filed a second interlocutory appeal, contending that the trial court abused its discretion by granting the motions to dismiss and denying their motion for an extension to cure. *See Curnel v. Methodist Hosp.*, No. 01-17-00742-CV, 2018 WL 4014590, at *2 (Tex. App.—Houston [1st Dist.] Aug. 23, 2018, no pet.) (mem. op.) ("*Curnel II*").

In *Curnel II*, the Court held that Dr. Sheer's reports on Methodist and the Nurse Defendants failed to adequately address cause-in-fact and foreseeability, as required to establish causation. *Id.* at *8–*9. The Court also held that the trial court abused its discretion by denying the Curnels' motion for an extension to cure because the expert reports were deficient but curable and reversed and remanded the case. *Id.* at *10.

On remand, the Curnels served three additional expert reports from Dr. Sheer, Fomenko, and Dr. D. Kett, addressing the deficiencies identified in *Curnel I* and *Curnel II*.

Willowbrook, Methodist, and the Nurse Defendants objected to the expert reports as deficient and moved to dismiss the Curnels' claims. The trial court granted the motion to dismiss. This interlocutory appeal followed.

## Motion to Dismiss

In their sole issue, the Curnels contend that the trial court abused its discretion by dismissing their claims against Willowbrook, Methodist, and the Nurse Defendants.

## A.     Applicable law and standard of review

Under the Medical Liability Act, a plaintiff asserting health care liability claims must timely serve each defendant physician and health care provider with one or more expert reports and a curriculum vitae of each expert whose opinion is offered to substantiate the merits of the claims. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (i); *see Mangin v. Wendt*, 480 S.W.3d 701, 705 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The expert report must provide a "fair summary" of the expert's opinions regarding the (1) applicable standards of care, (2) manner in which the care rendered by the physician or health care provider failed to meet the standards, and (3) causal relationship between that failure and the injury, harm, or

7

damages claimed. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6). A "fair summary of the expert's opinions" means that, at the least, the report must state more than mere conclusions and must instead explain the basis of the expert's opinion so as to link the conclusions to the facts of the case. *See Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010) (citing *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam)).

For standard of care and breach, the expert report must explain what the physician or health care provider should have done under the circumstances and what the physician or health care provider did instead. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001). For causation, the expert report must explain how and why the physician's or health care provider's breach proximately caused the plaintiff's injury. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017).

Causation consists of two components: (1) cause-in-fact and (2) foreseeability. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). A physician's or health care provider's breach was a cause-in-fact of the plaintiff's injury if the breach was a substantial factor in bringing about the harm, and absent the breach the harm would not have occurred. *Id.* Even if the harm would not have occurred absent the defendant's breach, "the connection between the defendant and the plaintiff's injuries simply may be too attenuated" for the breach to qualify as a

8

substantial factor. *Allways Auto Grp., Ltd. v. Walters*, 530 S.W.3d 147, 149 (Tex. 2017) (per curiam) (quoting *Union Pump Co. v. Allbritton*, 898 S.W.2d 773, 776 (Tex. 1995)). A breach is not a substantial factor if it "does no more than furnish the condition that makes the plaintiff's injury possible." *Id.* A physician's or health care provider's breach is a foreseeable cause of the plaintiff's injury if a physician or health care provider of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *Puppala v. Perry*, 564 S.W.3d 190, 197 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

The expert report is not required to prove the defendant's liability but only to provide notice of the conduct forming the basis of the plaintiff's claim. *Gracy Woods I Nursing Home v. Mahan*, 520 S.W.3d 171, 189 (Tex. App.—Austin 2017, no pet.). The report "need not anticipate or rebut all possible defensive theories that may ultimately be presented" in the case. *Owens v. Handyside*, 478 S.W.3d 172, 187 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). "Nothing in Section 74.351 suggests the preliminary report is required to rule out every possible cause of the injury, harm or damages claimed, especially given that Section 74.351(s) limits discovery before the report is filed." *Meyer v. Strahan*, 578 S.W.3d 165, 172 (Tex. App.—Tyler 2019, pet. denied) (citing *Baylor Med. Ctr. at Waxahachie, Baylor Health Care Sys. v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.)).

In reviewing the adequacy of an expert report, a trial court may not consider an expert's credibility, the data relied upon by the expert, or the documents that the expert failed to consider at this pre-discovery stage of the litigation. *See Mettauer v. Noble*, 326 S.W.3d 685, 691 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Gonzalez v. Padilla*, 485 S.W.3d 236, 245 (Tex. App.—El Paso 2016, no pet.). Instead, the trial court must limit its review to the "four corners" of the expert report and, when the question of adequacy hinges on the expert's qualifications, the "four corners" of the expert's curriculum vitae. *Mangin*, 480 S.W.3d at 706.

The statute's purpose is not to determine the merits of the claim but to rule out frivolous lawsuits at the onset of litigation, before the parties have conducted full discovery. *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 502 (Tex. 2015); *Mangin*, 480 S.W.3d at 706. As we have explained:

> The requirement to serve an expert report arises at the outset of litigation and before the opportunity for the plaintiff to engage in significant discovery, including taking oral depositions of the defendants. As such, the statute itself contemplates that the amount and quality of evidence available at the time of drafting the expert reports will be less than that available at trial on the merits or even the summary-judgment stage.

*Mangin*, 480 S.W.3d at 713 (citations omitted). Thus, the requirements of the statute have been variously described as a "lenient standard,"[5] "low threshold,"[6] and "relatively low bar."[7]

---

[5] *Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011).

If the plaintiff "fails to timely serve an expert report, then on the affected health care provider's motion the trial court must dismiss the pertinent health care liability claim with prejudice and award attorney's fees." *Baty v. Futrell*, 543 S.W.3d 689, 692 (Tex. 2018) (citing TEX. CIV. PRAC. & REM. CODE § 74.351(b)). However, if the motion challenges the adequacy of an otherwise timely report, the trial court may grant the motion 'only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the [Act's] definition of an expert report.'" *Baty*, 543 S.W.3d at 692–93 (quoting TEX. CIV. PRAC. & REM. CODE § 74.351(*l*)).

A report qualifies as an objective good faith effort to avoid dismissal if it discusses each element with sufficient specificity that it (1) informs the defendant of the specific conduct the plaintiff questions and (2) provides a basis for the trial court to conclude that the plaintiff's claims have merit. *Miller v. JSC Lake Highlands Operations*, *LP*, 536 S.W.3d 510, 513 (Tex. 2017) (per curiam). A trial court may read several reports in concert in determining whether a plaintiff has made a good-faith effort to comply with the Act's requirements. TEX. CIV. PRAC. &

---

6    *Loaisiga v. Cerda*, 379 S.W.3d 248, 264 (Tex. 2012) (Hecht, J., concurring in part and dissenting in part) ("An expert report, as we have interpreted it, is a low threshold a person claiming against a health care provider must cross merely to show that his claim is not frivolous.").

7    *Baty v. Futrell*, 543 S.W.3d 689, 698 (Tex. 2018) (Johnson, J., dissenting) (describing medical expert report requirements as interpreted by majority).

11

REM. CODE § 74.351(i); *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 43 (Tex. 2013) (noting Section 74.351(i) "authoriz[es] fulfilling the expert report requirements by serving multiple reports"). In determining whether an expert report constitutes an objective good faith effort to address each element, "a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report." *Puppala*, 564 S.W.3d at 197.

We review a trial court's ruling on a motion to dismiss a health care liability claim for an abuse of discretion. *Miller*, 536 S.W.3d at 512. Under this standard, we "defer to the trial court's factual determinations if they are supported by evidence, but review its legal determinations de novo." *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam). A trial court abuses its discretion if it acts arbitrarily or unreasonably or without reference to guiding rules or principles. *Bowie Mem'l Hosp.*, 79 S.W.3d at 52.

Two months after this Court decided *Curnel II*, the Texas Supreme Court's watershed opinion of *Abshire v. Christus Health*, 563 S.W.3d 219 (Tex. 2018), relaxed the standards for causation. *Id.* at 225–26. Per the Supreme Court, in reviewing the sufficiency of expert reports, courts do not determine whether causation is reasonable or believable. *Id.* at 226. Rather, the court stated that, "with respect to causation, the court's role is to determine whether the expert has

explained how the negligence conduct caused the injury." *Id*. A court's inquiry into the adequacy of an expert report is preliminary, and the determination of the merits should be decided at a later stage of the litigation proceedings. *Id*. "[T]he purpose of the expert report requirement is to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Id*. at 223.

After the decisions of *Curnel I* and *Curnel II*, this Court has applied the relaxed standards of *Abshire*. *See, e.g., New Med. Horizons, II, Ltd. v. Milner*, 575 S.W.3d 53 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *Tomball Tex. Hosp. Co., LLC v. Bobinger*, No. 01-18-00361-CV, 2019 WL 3801664, at *7 (Tex. App.—Houston [1st Dist.] Aug. 13, 2019, no pet. h.) (mem. op.). With this framework, we analyze the adequacy of the medical expert reports first as to Methodist and Willowbrook then as to the Nurse Defendants, then finally as to TMH Health Care Group.

## B.  Adequacy of reports on Methodist and Willowbrook

The Curnels supported their claim against Methodist and Willowbrook with expert reports from Fomenko, Dr. Kett, and Dr. Sheer.

We first note that Fomenko is a nurse, and a portion of her expert reports opined on causation. Under the Medical Liability Act, a nurse is not qualified to offer an expert opinion on causation. *See* TEX. CIV. PRAC. & REM. CODE §

74.351(r)(5)(C); *see also Peabody v. Manchac*, 567 S.W.3d 814, 823 (Tex. App.—Houston [14th Dist.] 2018, no pet.). Therefore, we will not consider Fomenko's opinions on the cause-in-fact or foreseeability components of the causation element.

Methodist asserts that we are unable to consider Dr. Kett's report because it addresses a new theory of liability: post-operative negligence. Specifically, Methodist argues that the Curnels did not assert this theory in their third amended petition. Rather, the third amended petition alleges that the nurses and physicians acted in a negligent manner before the liver biopsy because the liver biopsy was medically unnecessary and caused severe injuries to Curnel. Thus, Methodist contends that the third amended petition did not provide fair notice of the post-operative difficulties as a basis of the Curnels' claims. *See Pacheco-Serrant v. Munoz*, 555 S.W.3d 782, 793–94 (Tex. App.—El Paso 2018, no pet.) (explaining fair-notice requirement in health care liability cases). Because the Curnels' amended petition did not provide fair notice of the post-operative difficulties as a basis of their claim, we do not consider this new theory of liability for purposes of our review. *See Pacheco-Serrant*, 555 S.W.3d at 793–94; *Tanhui v. Rhodes-Madison*, No. 12-19-00149-CV, 2019 WL 4462672, at *3 (Tex. App.—Tyler Sept. 18, 2019, no pet. h.) (mem. op.) (declining to review an unpleaded theory of

14

liability for a health care liability claim). Moreover, Dr. Kett's report does not address Methodist in his report.

We begin our analysis by considering whether the expert reports from Dr. Sheer provide adequate opinions on causation. Proximate cause has two components: (1) cause-in-fact and (2) foreseeability. *Milner*, 575 S.W.3d at 69. We first address cause-in-fact, and then we address foreseeability.

### 1. Cause-in-fact

In *Curnel I*, the Court identified the deficiencies in Dr. Sheer's reports opining on cause-in-fact and advised the Curnels to "explain how and why additional information from the nurses would have led the physicians to cancel the biopsy if the information the physicians already had did not or how the nurses 'had either the right or the means to persuade' the physicians to cancel the biopsy." 562 S.W.3d at 568 (citing *Zamarripa*, 526 S.W.3d at 461).

Dr. Sheer asserted that the implementation of a "chain of command" or a "checks and balances" system would have prevented the liver biopsy because Curnel was "stable." Dr. Sheer attributed his conclusion to the physicians' and nurses' failure to document certain information that "resulted in confusion" and "significantly contributed to proceeding with the liver biopsy," resulting in Curnel's injuries. Dr. Sheer specifically explained that Dr. Naygandhi failed to document that he was informed by a nurse that a liver biopsy was scheduled. Dr.

Sheer further explained that the nurses failed to document that they informed Dr. Naygandhi of the scheduled liver biopsy. Dr. Sheer stated that there is nothing in the records demonstrating that the nurses placed an order for a medication evaluation. Because there is no evidence, Dr. Sheer presumed that a medication evaluation was never placed by the nurses at all and that the absence of the results from the evaluation did not allow the nurses or physicians to make an informed decision to proceed with the liver biopsy. According to Dr. Sheer, had the nurses placed a medication evaluation, requested the results of the evaluation, and communicated the results to the physician, then a "reasonable prudent physician would not have proceeded with the liver biopsy" and Curnel would have avoided the injuries from it. Thus, Dr. Sheer suggests that unless there was "evidence of acute liver failure or progressive liver dysfunction" from the results of the medication evaluation, then the nurses were "required to intervene . . . to stop the liver biopsy from proceeding."

Although the record shows that Dr. Naygandhi examined Curnel and ordered a review of her medications, there is nothing showing that the nurses requested the results of this review or communicated the results to the clinicians and physicians. Because these steps in the "chain of command" did not occur, the nurses could not have intervened to stop the scheduled liver biopsy if the results of the medication

16

evaluation suggested that Curnel had acute liver failure or progressive liver dysfunction.

Methodist argues that the reports do not explain how "anything a hospital employee, hospital, or hospital system would have communicated to the physicians would have changed Curnel's treatment or outcome given that the physician had the information . . . they needed to cancel the biopsy." We disagree because the statute governing expert reports requires a relatively low threshold to establish the cause-in-fact component. *Loaisiga*, 379 S.W.3d at 264 (interpreting TEX. CIV. PRAC. & REM. CODE § 74.351 and explaining that an expert report "is a low threshold . . . to show that [the] claim is not frivolous"). "An expert report need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court, particularly when discovery in the case may yield information that makes some potential theories untenable." *Bobinger*, 2019 WL 3801664, at *7 (citing *Owens*, 478 S.W.3d at 187). The expert must simply provide some basis that the defendant health care provider's act or omission proximately caused injury. *Id.*; *see also Palacios*, 46 S.W.3d at 879 (explaining that "a plaintiff need not present evidence in the report as if it were actually litigating the merits . . . the information in the report does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial"). Dr. Sheer's report meets the low threshold as required by the statute and sufficiently describes

17

how communication and nurse intervention would have prevented Curnel's liver biopsy and, ultimately, the injuries resulting from the liver biopsy. *Bobinger*, 2019 WL 3801664, at *7 (determining that the expert report satisfied the cause-in-fact element because the expert explained how and why the surgeons' reliance on communication of a patient's post-operative condition would have prevented patient's injuries).

Based on Dr. Sheer's expert reports, the trial court could have concluded Curnel made an objective good faith effort to comply with the expert report requirements. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6).

## 2. Foreseeability

In *Curnel I*, the Court identified the deficiency in Dr. Sheer's reports opining on foreseeability and advised the Curnels to "explain how and why Methodist's nurses should have anticipated Curnel's artery being nicked because of either Methodist's failure to implement and enforce policies and procedures requiring the evaluation of hepatotoxic medication or the nurses' failure to evaluate Curnel's medications for hepatotoxicity and to refuse to administer the drug." 562 S.W.3d at 568.

According to Dr. Sheer, Methodist's breach was a foreseeable based on "the biopsy consent form," "policies and procedures regarding medication evaluation," and "the chain of command." Specifically, Dr. Sheer explained that the significant

18

risks associated with liver biopsies, such as hemorrhage, must be disclosed on the "consent form for invasive diagnostic procedures" before a patient undergoes surgery. Dr. Sheer explained that Methodist included the risk of hemorrhage on Willowbrook's consent form, and "reasonable prudent nurses should [have] read and explain[ed] the complications before a patient signs the form." Thus, it was foreseeable to Methodist that any procedure that had a known risk from an invasive diagnostic procedure would result in harm if the cause of the problem, such as elevated enzymes, was not identified before proceeding with an invasive medical procedure.

As to the medication evaluation, Dr. Sheer explained that Methodist's failure to "evaluate medications for toxicity in a patient admitted for elevated liver values" resulted in "unwarranted diagnostic testing" before the nurses and physicians identified the actual cause of Curnel's elevated liver enzymes. Dr. Sheer further explained that, in such cases, a liver biopsy is an invasive procedure that "can cause uncontrolled hemorrhage from injury to blood vessels and should not be performed unless the necessity of the procedure warrants the risk." Because the "chain of command" policies and procedures were not implemented by Methodist, the nurses failed to take affirmative steps to "prevent the administration of well-known hepatoxic medications and the liver biopsy." Curnel's injury from the

19

"contraindicated liver biopsy" was inevitable due to "their failure to implement and enforce these" policies and procedures.

Methodist contends that Dr. Sheer's explanation on foreseeability is insufficient because the policies and procedures do not "explain how the existence of a policy regarding chain of command would have prevented Dr. Brodie from cutting Curnel's artery during the liver biopsy." Methodist suggests that in order to establish the foreseeability element, the expert report must specifically allege how and why Curnel's artery was cut during the liver biopsy and not merely rely on "speculation or conjecture." Methodist relies on the rationale in *Milner*, 575 S.W.3d at 75, to support its argument. In *Milner*, this Court explained why the expert report in *Curnel I* was deficient:

> As for *Curnel*, it is inapposite because it concluded that the causation report was deficient on cause-in-fact because the report stated that the subsequent treating physicians did have the additional information that the nursing staff allegedly failed to provide to them so that they could make the correct diagnosis.

This explanation accurately describes the expert reports at the time of *Curnel I*. However, Dr. Sheer's expert reports have been amended since then and now provide additional information about how the nurses should have performed a medication evaluation and communicated the results to the physician and stepped in to prevent the biopsy, an unnecessary invasive medical procedure during which Curnel's artery was cut. The additional information Methodist suggests is missing

from the reports is not required to prove liability at this pre-discovery stage of litigation. *See Mahan*, 520 S.W.3d at 189. Expert reports must provide a causal relationship between the breach and the injury, but case law rejects requiring every single detail to satisfy the requirements of Section 74.351. *Id.* (providing that a plaintiff is "not required to prove the defendant's liability, but rather to provide notice of what conduct forms the basis of the plaintiff's complaints.").

The Texas Supreme Court examined the issue of whether the trial court abused its discretion by denying the defendants' motion to dismiss for deficient expert reports in *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 512 (Tex. 2017) (per curiam). The patient reported that she had lost her dental bridge. *Id.* After unsuccessful attempts to locate her dental bridge, the patient began coughing and showing signs of chest congestion. *Id.* An on-call physician performed x-rays, which later revealed that the patient's dental bridge was lodged in her trachea. *Id.* This information was neither identified by the technician and physician or noted in a report. *Id.* The patient's condition worsened and she later died. *Id.*

The patient's daughter filed a health care liability claim and served expert reports. *Id.* The defendants moved to dismiss the claims for failure to serve adequate expert reports. *Id.* Finding the reports deficient, the trial court granted an extension to cure the deficiencies. *Id.* After the reports were amended, the trial

court denied the renewed motions to dismiss. *Id*. The intermediate appellate court reversed, holding the trial court abused its discretion in denying the motions to dismiss because one expert's opinion was read in isolation, stating "only that the failure to timely remove the foreign body 'can' lead to aspiration, which 'can' be deadly." *Id*. at 512, 514.

The patient's daughter petitioned for review in the Texas Supreme Court. *Id*. The court determined that the expert report identified the delay in discovering the dental bridge in her trachea need not "outline the conduct of a particular defendant who caused that delay because other reports supplied that information." *Id*. at 514. The court held that the expert reports adequately established the foreseeability component because the expert "ma[de] clear that failing to identify the lodged dental bridge and alert appropriate personnel could result in harm." *Id*. at 515.

Similarly, the court of appeals addressed whether expert reports adequately established causation in *JMA Partners, Inc. v. Guzman*, No. 05-17-01464-CV, 2019 WL 1615345, at *4 (Tex. App.—Dallas Apr. 16, 2019, pet. denied) (mem. op.). The patient underwent a routine cataract surgery, and the surgeon injected into the patient's eye a steroid medication, which was compounded by the pharmacy, causing permanent damage to his eye. *Id*. at *1. The expert report opined that the pharmacy failed to formulate, prepare, and test its steroid medication to meet a safe, nontoxic pH level. *Id*. at *5. The expert further opined

22

that this failure caused harm to the patient because "injury will occur if a compound's pH is not within a tolerable range for the confined space of the eye." *Id*. Disagreeing with appellee's contention that the expert required additional detail including, "either the specific pH of the medication . . . or an explanation of what caused the pH to become 'too high,' was required" to establish foreseeability, the court held that the expert report adequately "explains, to a reasonable degree, how and why the alleged breach caused injury" to the patient because the expert report adequately provided a causal relationship between the breach and the injury. *Id*.

Applying *Miller* and *JMA Partners*, we conclude that Methodist's challenge is overly narrow and ignores other parts of Dr. Sheer's report because it argues that the physicians had already documented a diagnosis of possible DILI and discontinued all hepatotoxic medications. Our review of Dr. Sheer's expert reports must be inclusive. *See Baty*, 543 S.W.3d at 694 (stating that "courts must view the report in its entirety, rather than isolating specific portions or sections"). Dr. Sheer's reports do not simply end with suggesting additional documentation and medication evaluation was necessary to avoid Curnel's injury. Rather, Dr. Sheer's reports explained that, with the standard of care in mind, the nurses should have taken affirmative action to request the results of a medication evaluation, report these results to the hospitalist, and require the hospitalist to determine the actual

23

cause of the elevated liver enzymes; and, if the cause did not justify a liver biopsy, then, in that instance, cancel the scheduled liver biopsy. Because the physicians had already diagnosed Curnel with DILI and discontinued the medications causing the DILI, the scheduled liver biopsy was unnecessary given that she showed signs of improvement, which Dr. Naygandhi and Dr. Ugbarugba both documented, and a medical professional within the chain of command (a nurse, the treating physicians, or the radiologist scheduled to perform the liver biopsy) was supposed to cancel the biopsy, but did not. For these reasons, we hold that Dr. Sheer's reports represents an objective good-faith effort to adequately explain "how and why" Methodist's breach of the standard of care caused Curnel's liver biopsy and subsequent liver injury.

## C.    Adequacy of reports on the Nurse Defendants

Next, we consider whether the expert reports from Dr. Sheer provide adequate opinions on causation. We first address the cause-in-fact component, and then we address the foreseeability component.

### 1.    Cause-in-fact

In *Curnel II*, the Court determined that Dr. Sheer's reports opining on cause-in-fact did not "(1) explain how and why the nurses' failure to evaluate Curnel's medications and refrain from administering nitrofurantoin caused the biopsy and resulting injuries when the physicians themselves evaluated Curnel's medications

and discontinued nitrofurantoin without cancelling or postponing the biopsy, (2) explain how the nurses 'had either the right or the means to persuade' the physicians to cancel the biopsy . . . , or (3) state that the nurses were part of the decision to perform the biopsy or its timing." 2018 WL 4014590, at *8. The Nurse Defendants argue that Dr. Sheer's seven expert reports "refers generally to 'nursing staff' and does not explain how or why any of the three named nurses proximately caused Curnel's injuries."

According to Dr. Sheer, the chain of command consists of physicians, pharmacists, and nurses within the nursing department, pharmacy, and radiology unit. Dr. Sheer reviewed the policies and procedures and did not find any policies and procedures providing for the utilization of the "chain of command to prevent administration of well-known hepatoxic medications" or to stop the liver biopsy from proceeding. Dr. Sheer stated that the Nurse Defendants' failure to evaluate Curnel's medications caused the biopsy and the injuries because they required to "refuse to administer nitrofurantoin and advise the physicians that refusal was due to the potential for causing liver injury." Sheer opined that the Nurse Defendants "deprived the physicians of relevant diagnostic information and resulted in their motivation to order additional testing, including the liver biopsy, to determine the cause of her abnormal liver values."

Although the physicians had already diagnosed Curnel with DILI and discontinued the medications causing the DILI in this case, Sheer opined that the Nurse Defendants were required to "request that the biopsy be discontinued pending the results, [and i]f the physicians failed to [cancel the biopsy], the standard of care required the nurses to intervene and implement the chain of command to stop the liver biopsy from proceeding." Sheer further opined that an invasive procedure, such as a liver biopsy, "carries significant risks such as hemorrhage," and because the Nurse Defendants were required to "understand the diagnoses, indications, and complications of the diagnostic testing ordered," their failure to take affirmative acts to ensure that the liver biopsy was not performed caused Curnel's injuries from an unwarranted liver biopsy.

The Nurse Defendants review Dr. Sheer's expert reports too narrowly. Dr. Sheer does not contend that Curnel's damages were caused only by administering nitrofurantoin. Instead, Dr. Sheer's expert opinion is that the Nurse Defendants should have recognized the cause of Curnel's abnormal liver values before proceeding with a liver biopsy. And even if the physicians had already diagnosed Curnel with DILI, then the Nurse Defendants should have known that a liver biopsy was not the next course of action. Thus, the Nurse Defendants were required to personally intervene or contact each person within the chain of command to prevent the radiologist from performing the procedure. Had the Nurse

26

Defendants done so, the radiologist would not have performed the liver biopsy, proximately causing Curnel's injuries.

## 2. Foreseeability

The Court also determined that Dr. Sheer's reports opining on foreseeability did not explain how and why the Nurse Defendants "explain how and why the nurses should have anticipated that their negligent failure to evaluate Curnel's medications and to refrain from administering the drug would result in Curnel's artery being nicked during a biopsy of her liver." *Curnel II*, WL 4014590, at *8.

The Nurse Defendants argue that Sheer's expert reports do not specifically identify the Nurse Defendants or establish that they were "involved with the liver biopsy consent form for Curnel," but were only responsible for "Curnel's care on" October 8 through October 10.

The question is not who obtained Curnel's consent disclosing the risks associated with a liver biopsy. *See Miller*, 536 S.W.3d at 514 (explaining that the expert report "did not need to specifically name the person who caused the delay or otherwise outline the conduct of a particular defendant who caused that delay"). Rather, the question is whether the Nurse Defendants failed to appreciate the known risks which were disclosed on the consent form. *See Curnel I*, 562 S.W.3d at 566. Dr. Sheer's reports discussed the anticipated dangers caused by the negligent act or omission. Dr. Sheer stated that the nurses were aware of

hemorrhage as a generally-known risk of an invasive medical procedure because it was disclosed on the consent form.[8] The Nurse Defendants were aware that a liver biopsy was scheduled and had a duty to provide the disclosures on the consent form. Because the Nurse Defendants did not "evaluate medications for toxicity in a patient admitted for elevated liver values," the radiologist was scheduled to perform an "unwarranted diagnostic testing" before the nurses and physicians identified the actual cause of Curnel's elevated liver enzymes. And, Dr. Sheer stated that, because the Nurse Defendants negligently omitted to implement the chain of command to personally intervene before knowing the results of the medical evaluation, the Nurse Defendants should have anticipated that Curnel would have hemorrhaged. Therefore, we conclude that Dr. Sheer's expert reports explain how and why the Nurse Defendants' failure to evaluate Curnel's medications and discontinue nitrofurantoin caused the biopsy and resulting injuries.

---

[8]    *C.f. Curnel I*, 562 S.W.3d at 566 ("Sheer does not address whether the risk was generally known or recognized by hospitalists like Esantsi before the surgery. Nor does Sheer provide information demonstrating that the risk is part of the informed consent disclosures or that a hospitalist of ordinary intelligence would have anticipated the danger of a patient's blood vessel being cut during this type of procedure.").

Dr. Sheer's expert reports represent a basis for the trial court to have concluded that they represent an objective good faith effort to comply with the expert report requirements. *See* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*), (r)(6).

At this preliminary stage of litigation, the Court does not pass judgment on the strength or weakness of the experts' theories. "[W]ith respect to causation, the court's role is to determine whether the expert has explained how the negligent conduct caused the injury. Whether this explanation is believable should be litigated at a later stage of the proceedings." *Abshire*, 563 S.W.3d at 226. The ultimate evidentiary value of expert opinions is a matter to be determined at summary judgment and beyond. *Id.*

## Conclusion

Having concluded that the expert reports provide notice of the conduct forming the basis of the Curnels' claims, we reverse the trial court's judgment dismissing their health care liability claims and remand the case to the trial court for further proceedings consistent with this opinion.[9]

Sarah Beth Landau
Justice

Panel consists of Justices Lloyd, Goodman, and Landau.

---

[9] Willowbrook, Methodist, TMH Health Care Group, and the Nurse Defendants filed an objection and motion to strike the appendix to the Curnels' amended reply brief. They contend that the documents attached to the reply brief are not part of the appellate record. Because we have not considered any matters outside the appellate record, we deny the motion to strike as moot.