**Opinion issued July 14, 2022**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-20-00801-CV

————————————

**APOLLO HEALTHCARE AT WILLOWBROOK, LLC D/B/A THE MEDICAL RESORT AT WILLOWBROOK, MUHAMMAD HANIF, NABIL KHOURY, ASHIQUEALI POONAWALA, AND ARCHANA THOTA, Appellants**

**V.**

**MARK MCCAMMON, INDIVIDUALLY, AND AS REPRESENTATIVE OF THE ESTATE OF PATRICIA PHILLIPS, DECEASED, Appellee**

———————————————————————————————————

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-16211**

———————————————————————————————————

**MEMORANDUM OPINION**

In this interlocutory appeal,[1] appellants, Apollo Healthcare at Willowbrook, LLC d/b/a The Medical Resort at Willowbrook ("Willowbrook"), Muhammad Hanif, M.D. ("Hanif"), Nabil Khoury ("Khoury"), Ashiqueali Poonawala, M.D. ("Poonawala"), and Archana Thota ("Thota") (collectively, "Appellants"), challenge the trial court's order denying their motions to dismiss the health care liability claims brought against them by appellee Mark McCammon ("McCammon"), individually and as representative of the estate of Patricia Phillips, deceased. In multiple issues, Appellants argue that the trial court abused its discretion by denying their motions to dismiss because McCammon's expert report failed to comply with the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code.

We affirm.

## Background

McCammon, individually and as representative of the estate of his deceased wife Patricia Phillips ("Phillips"), filed a health care liability claim against Appellants under Chapter 74 of the Texas Civil Practice and Remedies Code, alleging negligence in the care and treatment Phillips received while a resident at Willowbrook, a nursing home. He claims that the profound neglect suffered by

---

[1] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(9).

2

Phillips resulted in significant damages and her untimely death. He asserts a survival action on behalf of her estate and a wrongful death cause of action in his individual capacity.

In his petition, McCammon alleged that Phillips was 67 years old at the time of her admission on January 20, 2018 at Willowbrook. She had a history of dementia, needing to be fed by gastrostomy tube, and had a significantly high risk of falls due to her overall mental and physical condition. Upon admission, the staff, nurses, and attending physicians at Willowbrook performed a Fall Risk Assessment that noted her fall history within the past six months and determined that she was at a high risk of falls. The Fall Risk Assessment further noted that Phillips "exhibits loss of balance while standing," that she "requires hand[s]-on assistance to move from place to place," and that she presented with a "decrease in muscle coordination." The Fall Risk Assessment determined that Phillips required assistance with bed mobility, transferring, ambulating, dressing, bathing, and toilet use. Consistent with the Fall Risk Assessment, staff, nurses, and attending physicians at the nursing home repeatedly noted that Phillips was at a high risk for falls due to gait problems and impaired balance.

Despite the determination that Phillips was at a high risk for falls and required assistance in all aspects of mobility, she fell at least five times while in the care of the staff and attending physicians at Willowbrook. Two falls resulting in bone

fractures and head trauma occurred within three months of admission. Specifically, on or about March 16, 2018, she was treated by an orthopedic surgeon for a fractured right wrist after suffering from a fall the night before. On or about April 20, 2018, she suffered another fall that resulted in a visit to the emergency room, where it was determined that she had a fractured right index finger and that her fractured wrist from the previous fall was not healing. Phillips also suffered a head injury during the April fall, which led to a severe decline in her mental health. When Phillips returned to Willowbrook, she suffered more falls before being removed from the nursing home and continuing care in her own home until she died on December 13, 2018.

McCammon retained Dr. Alex Lechin—an expert in critical and skilled nursing care as well as nursing home and hospital administration—to prepare an expert report pursuant to the requirements of Chapter 74 of the Texas Civil Practice and Remedies Code ("Chapter 74" or the "Medical Liability Act").[2] McCammon served Appellants with Dr. Lechin's expert report and curriculum vitae ("CV") on June 17, 2020. Appellants timely objected to Dr. Lechin's expert report as inadequate under Chapter 74 and moved to dismiss. The trial court granted in part Appellant's objections to the expert report, denied Appellants' motions to dismiss, and granted McCammon 30 days to cure any deficiencies. McCammon served Dr.

---

[2] *See id.* §§ 74.001–.507 ("Medical Liability Act").

4

Lechin's amended expert report and CV on September 10, 2020. Appellants timely filed motions to dismiss for failure to cure the expert report.

The trial court heard arguments on Appellants' objections to Dr. Lechin's amended report on November 2, 2020 and took the matter under advisement. The next week, the trial court entered an order overruling Appellants' objections and denying their motions to dismiss. Appellants timely filed this interlocutory appeal.

**Motions to Dismiss**

Appellants contend that the trial court abused its discretion by denying their motions to dismiss McCammon's health care liability claims for failure to serve an adequate expert report. Specifically, in Hanif and Poonawala's first issue, they contend that Dr. Lechin's opinions about the standard of care and breach are conclusory and unsupported by the facts. In their second issue, Hanif and Poonawala contend that Dr. Lechin failed to adequately establish a causal relationship between their alleged breach of the standard of care and Phillips's injuries.

In Willowbrook, Khoury, and Thota's first issue, they contend that Dr. Lechin's amended expert report fails to adequately address medical causation and injury. In connection with this issue, they also argue that Dr. Lechin's amended expert report contains no causation analysis linking Phillips's injuries with her death, there is no basis for McCammon's wrongful death claim, and the claim should be dismissed. In their second issue, Willowbrook, Khoury, and Thota contend that the

5

amended expert report is conclusory and fails to sufficiently describe how they breached the standard of care. Finally, in their third issue, they contend that Dr. Lechin's amended expert report improperly applies a single standard of care to all appellants.

## A. Standard of Review

We review a trial court's ruling on a motion to dismiss a health care liability claim for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015) (per curiam). We "defer to the trial court's factual determinations if they are supported by evidence," but we review its legal determinations de novo. *Id.* "A trial court abuses its discretion if it rules without reference to guiding rules or principles." *Id.*

## B. Healthcare Liability Expert Report Requirements

Under the Medical Liability Act, a plaintiff asserting health care liability claims must timely serve each defendant physician and health care provider with one or more expert reports and a CV of each expert whose opinion is offered to substantiate the merits of the claims. TEX. CIV. PRAC. & REM. CODE § 74.351(a), (i); *see Mangin v. Wendt*, 480 S.W.3d 701, 705 (Tex. App.—Houston [1st Dist.] 2015, no pet.). The standard for serving an adequate expert report is well established. The expert report must provide a "fair summary" of the expert's opinions regarding the (1) "applicable standards of care," (2) "manner in which the care rendered by the

6

physician or health care provider failed to meet the standards," and (3) "causal relationship between that failure and the injury, harm, or damages claimed." TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017) (per curiam). For standard of care and breach, the expert report must explain what the physician or health care provider should have done under the circumstances and what the physician or health care provider did instead. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 880 (Tex. 2001). For causation, the expert report must explain how and why the physician's or health care provider's breach proximately caused the plaintiff's injury. *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 459–60 (Tex. 2017).

When the plaintiff timely serves an expert report, and the defendant timely files a motion to dismiss challenging the adequacy of the report, the trial court may take one of three actions. *Mangin*, 480 S.W.3d at 705. First, if the trial court concludes that the report is adequate, it must deny the motion. *Id.* Second, if the trial court concludes that the report does not constitute an objective good faith effort to comply with the statute, it must grant the motion. *Id.*; *see* TEX. CIV. PRAC. & REM. CODE § 74.351(*l*). Third, if the trial court concludes that the report is an objective good faith effort to comply with the statute but is nevertheless deficient in some way,

it may grant the plaintiff one 30-day extension to cure the deficiency and must grant the extension if the deficiency is curable. *Mangin*, 480 S.W.3d at 705–06.

A report qualifies as an objective good faith effort to comply if it (1) informs the defendant of the specific conduct the plaintiff questions and (2) provides a basis for the trial court to conclude that the plaintiff's claims have merit. *Baty v. Futrell*, 543 S.W.3d 689, 693–94 (Tex. 2018); *Mangin*, 480 S.W.3d at 706. "In assessing the sufficiency of a report, a trial court may not draw inferences; instead, it must exclusively rely upon the information contained within the four corners of the report." *Cornejo v. Hilgers*, 446 S.W.3d 113, 123 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *see Baty*, 543 S.W.3d at 693.

The purpose of the expert-report requirement is not to determine the merits of the claim but to rule out frivolous lawsuits at the onset of litigation, before the parties have conducted full discovery. *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 502 (Tex. 2015); *Mangin*, 480 S.W.3d at 706. As this Court has explained:

> The requirement to serve an expert report arises at the outset of litigation and before the opportunity for the plaintiff to engage in significant discovery, including taking oral depositions of the defendants. As such, the statute itself contemplates that the amount and quality of evidence available at the time of drafting the expert reports will be less than that available at trial on the merits or even the summary-judgment stage.

*Mangin*, 480 S.W.3d at 713 (citations omitted). In reviewing the sufficiency of an expert report at this early stage of the litigation, a trial court may not consider an

8

expert's credibility, the data the expert relies on, or the documents the expert relies on or failed to consider. *See Mettauer v. Noble*, 326 S.W.3d 685, 691 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *Gonzalez v. Padilla*, 485 S.W.3d 236, 245 (Tex. App.—El Paso 2016, no pet.).

### 1. Standard of Care and Breach

Standard of care is defined by what an ordinarily prudent health care provider or physician would have done under the same or similar circumstances. *Palacios*, 46 S.W.3d at 880; *Kingwood Pines Hosp., LLC v. Gomez*, 362 S.W.3d 740, 747 (Tex. App.—Houston [14th Dist.] 2011, no pet.). "Identifying the standard of care is critical: Whether a defendant breached his or her duty to a patient cannot be determined absent specific information about what the defendant should have done differently." *Palacios*, 46 S.W.3d at 880. "While a 'fair summary' is something less than a full statement of the applicable standard of care and how it was breached, even a fair summary must set out what care was expected, but not given. *Id.*

When a plaintiff sues more than one defendant, the expert report must set forth the standard of care for each defendant and explain the causal relationship between each defendant's individual acts and the injury. *Kingwood Pines*, 362 S.W.3d at 748. However, grouping defendants together in discussing the relevant standards of care does not render an expert report inadequate when all the defendants owed the same duty to the plaintiff. *Bailey v. Amaya Clinic, Inc.*, 402 S.W.3d 355, 366–67 (Tex.

9

App.—Houston [14th Dist.] 2013, no pet.) (holding same standard of care may be applied to more than one health care provider if they all owed same duty to patient); *Sanjar v. Turner*, 252 S.W.3d 460, 466–67 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (same).

### 2. Causation

For causation, an expert report must explain "how and why" the physician's or health care provider's breach proximately caused the plaintiff's injury. *Zamarripa*, 526 S.W.3d at 459–60. Proximate cause has two components: cause-in-fact and foreseeability. *Id.* at 460. A physician's breach was a cause-in-fact of the plaintiff's injury if the breach was a substantial factor in bringing about the harm, and absent the breach (i.e., but for the breach), the harm would not have occurred. *Id.* A physician's breach was a foreseeable cause of the plaintiff's injury if a physician of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *See Price v. Divita*, 224 S.W.3d 331, 336 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). "No particular words or formality are required, but bare conclusions will not suffice." *Scoresby v. Santillan*, 346 S.W.3d 546, 556 (Tex. 2011). Thus, to provide more than a conclusory statement on causation, an expert report must include an "explanation tying the conclusion to the facts" and showing, to a reasonable degree, "how and why the breach caused the

injury based on the facts presented." *Jelinek v. Casas*, 328 S.W.3d 526, 539–40 (Tex. 2010).

Additionally, an expert report "need not anticipate or rebut all possible defensive theories that may ultimately be presented to the trial court." *Owens v. Handyside*, 478 S.W.3d 172, 187 (Tex. App.—Houston [1st Dist.] 2015, pet. denied). Nor must the report "rule out every possible cause of the injury, harm, or damages claimed, especially given that section 74.351(s) limits discovery before a medical expert's report is filed." *Baylor Med. Ctr. at Waxahachie v. Wallace*, 278 S.W.3d 552, 562 (Tex. App.—Dallas 2009, no pet.).

In determining whether the causation opinions are conclusory, we must remain mindful that expert-report challenges are made at this early, pre-discovery stage in the litigation, not when the merits of the health care liability claim are being presented to the factfinder to determine liability. *Cf. Baty*, 543 S.W.3d at 697 & n.10 (rejecting argument that expert report was inadequate on standard of care, breach, and causation; concluding that expert report sufficed "particularly in light of the purposes the report is intended to serve" at early stage in litigation; and stating that "[a]dditional detail is simply not required at this stage of the proceeding").

## C. Whether McCammon's wrongful death claim must be dismissed because it was not addressed in the expert report

In a portion their first issue, Willowbrook, Khoury, and Thota argue that because Dr. Lechin's amended expert report does not link Phillips's injuries

sustained as a result of her falls at Willowbrook to her death and does not opine on the cause of Phillips's death, McCammon has not served an expert report that supports his wrongful death claim. They further argue that the wrongful death claim must be dismissed because of the insufficient expert report even if the amended expert report supports the survival claim. We disagree.

In *Certified EMS, Inc. v. Potts*, the Texas Supreme Court addressed the question of whether an expert report must address every liability theory alleged by the plaintiff in order to be sufficient. 392 S.W.3d 625, 630–32 (Tex. 2013). The Texas Supreme Court noted that the language of Chapter 74 requires a claimant to file an expert report "[i]n a health care liability claim," but it does not require an expert report to address every liability theory pleaded by the plaintiff. *Id.* at 630. The Court also stated that a valid expert report must summarize the applicable standard of care, explain how a health care provider failed to meet that standard, and establish the causal relationship between the failure and the harm alleged. *Id.* The Court held, "A report that satisfies these requirements, even if as to one theory only, entitles the claimant to proceed with a suit against the physician or health care provider." *Id.* The Court concluded that if the trial court determines that one liability theory is supported by the expert report, the plaintiff's claim is not frivolous and the suit may proceed. *Id.* at 631. This Court has explicitly applied the reasoning and holding of *Certified EMS* to cases involving survival and wrongful death claims. *See Bay Oaks*

12

*SNF, LLC v. Lancaster*, 555 S.W.3d 268, 278–79 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) (holding that if claimant's expert report satisfied section 74.351's requirements as to survival claim, even though expert report did not address wrongful death claim, trial court did not abuse its discretion by denying healthcare providers' motion to dismiss, and entire case could proceed).

Accordingly, we conclude that if Dr. Lechin's amended expert report is sufficient as to McCammon's survival claim, McCammon's entire case against Appellants, including the wrongful death claim, may proceed. *See Certified EMS*, 392 S.W.3d at 630–31; *Bay Oaks SNF, LLC*, 555 S.W.3d at 278–79. To the extent Willowbrook, Khoury, and Thota argue otherwise, we overrule rule this portion of their first issue.

We therefore turn to the sufficiency of Dr. Lechin's amended expert report.

**D.     Whether Dr. Lechin's amended expert report supports McCammon's survival claim**

Appellants contend that Dr. Lechin's amended expert report does not provide a "fair summary" of his expert opinions because his opinions on the applicable standards of care, breach, and causation are conclusory. Willowbrook, Khoury, and Thota raise an additional argument that the amended expert report is deficient because it improperly applies the same standard of care to all Appellants. We address this argument first.

**1. Dr. Lechin's amended expert report did not improperly group Appellants together for purposes of the standard of care.**

In their third issue, Willowbrook, Khoury, and Thota argue that Dr. Lechin's amended expert report improperly applies one standard of care to all Appellants. They contend that the amended expert report "fails to explain what standards of care apply to each alleged wrongdoer and what each alleged wrongdoer did wrong with respect to [Phillips]," does not "explain each alleged wrongdoer's connection with [Phillips] or identify any health care or treatment provided by each alleged wrongdoer to [Phillips]," and does not explain "why the individual defendants owe the same standard of care to [Phillips] as each other or Willowbrook, a business entity." We disagree.

In the amended expert report, Dr. Lechin explained that Phillips was admitted to Willowbrook, a nursing home, and described Willowbrook's, Khoury's, Thota's, and Poonawala's relationship with Phillips. Specifically, Dr. Lechin opined:

- Apollo Healthcare at Willowbrook, LLC d/b/a The Medical Resort at Willowbrook, Senior Care Excellence, LLC,[3] Archana Thota, Nabil Khoury, and Ashiqueali Poonawala were responsible for hiring, training[,] and managing staff to effectively develop and implement care for the safe treatment of Ms. Phillips.

- Archana Thota, as manager and director of Senior Care Excellence, LLC, is responsible for ensuring the nursing home is adequately staffed with qualified nurses and nurse assistants and for ensuring that nursing home staff and attending physicians meet the standard

---

[3] Though Senior Care Excellence, LLC is listed in Dr. Lechin's amended expert report, that entity was not named as a defendant.

14

of care with respect to the prevention of falls for patients who are at a high risk for falls such as Ms. Phillips.

- Nabil Khoury and Ashiqueali Poonawala, as owners of Apollo Healthcare at Willowbrook, LLC d/b/a The Medical Resort at Willowbrook, are responsible for ensuring the nursing home is adequately staffed with qualified nurses and nurse assistants and for ensuring that nursing home staff and attending physicians meet the standard of care with respect to the prevention of falls for patients who are at a high risk for falls such as Ms. Phillips.

Based on these relationships and responsibilities, Dr. Lechin opined that the standards of care applicable to Willowbrook, Khoury, Thota, and Poonawala required that the staff, among other things, (1) "[d]evelop a comprehensive care plan that sets forth identified (actual or potential) problem areas, sets short and long-term goals for positive outcomes, and outlines specific interventions designed to prevent adverse outcomes from known problem areas"; (2) "[i]mplement the care plan on [Phillips's] behalf"; (3) "[u]pdate the care plan consistent with [Phillips's] response"; (4) "follow[] [the care plan] to prevent falls and injuries in patients who are at high risk for falls"; (5) "[i]nvestigate incidents/accidents and document in the medical record every accident/incident"; and (6) "[i]n patients who are at a high risk for falls, provide enough staff on duty to properly care for patients who require assistance." Dr. Lechin further opined:

- In particular, to meet the standard of care for fall prevention "nursing facilities are required to have adequate care plans in place and followed to prevent falls and injuries such as the use of bed and chair alarms, self-releasing seatbelts, and other interventions."

15

- "In a patient who has fallen and continues to be a high risk for falls and injuries, a sitter or family member [should] be used to attend to the patient for their safety and to prevent falls and injuries."

- "For patients who require assistance with bed mobility, transferring, ambulating, dressing, bathing and toilet use, the nursing home must be adequately staffed with qualified nurses and nurse assistants to render timely and effecti[ve] care upon request."

Dr. Lechin concluded that, in his opinion, Willowbrook, Khoury, Thota, and Poonawala violated these standards of care by "failing to develop and follow an adequate fall-prevention plan for [Phillips], failing to properly train staff, failing to adequately staff the facility with qualified nurses and nurse assistants, failing to update her care plan consistent with her response, failing to investigate the causes of numerous falls, failing to document every accident/incident in the medical record, and failing to ensure that [Phillips] was provided timely assistance upon request."

Thus, although Appellants are correct that Dr. Lechin applies the same standards of care to Willowbrook, Khoury, Thota, and Poonawala, he explains why—based on their responsibilities as a nursing facility and its administrators and owners to "manag[e] staff to effectively develop and implement care for the safe treatment of Ms. Phillips," "ensur[e] the nursing home is adequately staffed with qualified nurses and nurse assistants," and "ensur[e] that nursing home staff and attending physicians meet the standard of care with respect to the prevention of falls for patients who are at a high risk for falls such as Ms. Phillips." Based on the above, we conclude that Dr. Lechin sufficiently explained that Willowbrook, Khoury,

16

Thota, and Poonawala all owed the same duties to Phillips. Dr. Lechin was not required to set out a different standard of care as to each Appellant because he opined that multiple providers all owed Phillips the same standard of care. *See Harvey v. Kindred Healthcare Operating, Inc.*, 578 S.W.3d 638, 649 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (concluding that expert was not required to set out different standard of care as to each employee because she opined that multiple providers all owed decedent same standard of care); *Bailey*, 402 S.W.3d at 367 (rejecting argument that expert report was deficient for applying same standard of care to doctor and clinic because expert report sufficiently explained that doctor and clinic owed same duties to plaintiff).

With respect to Hanif, Dr. Lechin opined that many of the same standards of care apply to Hanif as Phillips's attending physician. However, he included an additional standard of care not applicable to the remaining Appellants—"[i]n patients who have fallen and suffered major injuries such as bone fractures, develop and implement a physical therapy plan"—and also did not apply two of the listed standards of care to Hanif which related to adequate staffing.[4] Thus, we disagree that

---

[4]     Specifically, Dr. Lechin opined that Willowbrook, Khoury, Thota, and Poonawala were subject to the following two standards of care that were not listed for Hanif: (1) "[a]dequately staff the facility with registered nurses and certified nursing assistants to ensure timely responses to patients who request assistance," and (2) "[i]n patients who are at a high risk for falls, provide enough staff on duty to properly care for patients who require assistance."

17

Dr. Lechin applies all of the same standards of care to Hanif as he does to the remaining Appellants.

Furthermore, as to the standards of care that overlap between Hanif and the remaining Appellants, Dr. Lechin opined that Hanif was required to meet these standards of care as Phillips's attending physician and, as explained above, that the remaining Appellants, based on their responsibilities as a nursing facility and its administrators and owners, were required to "manag[e] staff to effectively develop and implement care for the safe treatment of Ms. Phillips" and "ensur[e] that nursing home staff and attending physicians meet the standard of care with respect to the prevention of falls for patients who are at a high risk for falls such as Ms. Phillips." Thus, as we concluded above, Dr. Lechin sufficiently explained that Appellants, including Hanif, all owed the same duties to Phillips. *See Harvey*, 578 S.W.3d at 649; *Bailey*, 402 S.W.3d at 367.

We overrule Willowbrook, Khoury, and Thota's third issue.

### 2. Dr. Lechin's opinions as to standard of care and breach are not conclusory.

Appellants argue that Dr. Lechin's amended expert report fails to inform Appellants of the care that was expected under the circumstances, making his opinions as to the standard of care and breach conclusory.[5] Specifically, Appellants

---

[5] This issue is raised in Willowbrook, Khoury, and Thota's second issue, and in Hanif and Poonawala's first issue.

18

contend that Dr. Lechin's opinions are "ambiguous, lacking essential details, speculative, replete with contradictions and make it impossible to determine whether [McCammon's] claims have merit." Appellants further contend that Dr. Lechin generally claims that Appellants breached "a laundry list of twelve standards," but never explains in detail how Appellants breached each of these standards of care. Again, we disagree.

According to Dr. Lechin's report, Phillips was at high risk for falls when admitted to Willowbrook, as documented by the Fall Risk Assessment performed on her by the staff, nurses, and attending physicians at the time of admission. She was at high risk for falls because of "weakness, balance problems, and memory deficits." According to Dr. Lechin, for patients such as Phillips, "it is extremely important to prevent falls that can cause life threatening injuries." Due to her high risk for falls, she was required to be "assisted with all activities out of bed including transfers and ambulation," as well as dressing, bathing, and toilet use.

In light of Phillips's fall risk, Dr. Lechin opined that Appellants had a duty to, among other things,[6] (1) "[d]evelop a comprehensive care plan that sets forth

---

[6]  Although Appellants contend that Dr. Lechin's amended expert report does not demonstrate how Appellants breached each of the twelve standards of care, we do not have to evaluate each articulated standard of care and breach because Dr. Lechin was only required to meet the expert report requirements as to one theory. *See Harvey v. Kindred Healthcare Operating, Inc.*, 578 S.W.3d 638, 649 (Tex. App.— Houston [14th Dist.] 2019, no pet.) (focusing analysis on one standard of care, even

identified (actual or potential) problem areas, sets short and long-term goals for positive outcomes, and outlines specific interventions designed to prevent adverse outcomes from known problem areas"; (2) "[i]mplement the care plan on [Phillips's] behalf"; (3) "[u]pdate the care plan consistent with [Phillips's] response"; (4) "follow[] [the care plan] to prevent falls and injuries in patients who are at high risk for falls"; and (5) "[i]nvestigate incidents/accidents and document in the medical record every accident/incident." Willowbrook, Khoury, Thota, and Poonawala also had a duty to "patients who are at a high risk for falls" to "provide enough staff on duty to properly care for patients who require assistance." And Hanif had a duty to "patients who have fallen and suffered major injuries such as bone fractures" to "develop and implement a physical therapy plan." Dr. Lechin further stated that because Phillips "was found to be at high risk of falls upon admission to the nursing home, requiring that she be assisted with all activities out of bed including transfers and ambulation," the standard of care required that the care plan for Phillips set out "interventions to be taken to prevent falls," including "bed and chair alarms, self-releasing seat belts or lap buddies, timely physical assistance for transfers, [and] documentation of every accident/incident in the medical record following an investigation[.]"

---

though expert report opined on three, as expert was only required to meet expert report requirements as to one theory).

Dr. Lechin opined that Willowbrook, Khoury, Thota, and Poonawala violated these duties "by failing to develop and follow an adequate fall-prevention plan for [Phillips], . . . failing to investigate the causes of numerous falls, failing to document every accident/incident in the medical record, and failing to ensure that [Phillips] was provided timely assistance upon request." Similarly, Dr. Lechin stated that Hanif violated these duties "by failing to develop and follow an adequate fall prevention plan, . . . failing to investigate the causes of numerous falls and fail[ing] to document every accident/incident in the medical record, and failing to develop and implement a physical therapy plan for Ms. Phillips'[s] broken wrist following the first of her two major falls."

Dr. Lechin then gave specific examples of these failures. For instance, with respect to the failure to implement and follow Phillips's care plan, Dr. Lechin stated:

> The facility's care plan mandated that [Phillips] receive a low bed and that care be provided with assistance. In patients who are totally dependent on staff for performance of activities such as bed mobility, transfers, or locomotion, physical assistance with staff members and supervision needs to be provided for these activities to prevent falls and injuries. [Phillips's] care plans should have been followed to prevent falls and injuries. However, even though the medical records noted that [Phillips] required two-person assist with all activities including bed mobility and transfers, the staff did not provide her with this assistance. The facility's failure to provide [Phillips] physical assistance and supervision of staff constitutes a violation of the standard of care and caused her fall and injuries.

Dr. Lechin also described Appellants' failure to provide assistance to Phillips, which resulted in her April fall, stating:

21

On April 20, 2018, [Phillips] suffered from another fall, which resulted in a visit to the emergency room. It was determined then that [Phillips] had fractured her right index finger from this fall and her fractured wrist from the previous fall was not healing. These injuries caused constant pain and suffering. The pain was prolonged by the failure to develop and implement a proper physical therapy plan. While the emergency room records indicate that certain safety measures were in place, including placement of the call light within reach and bedrails, the cause of the fall was the failure of the staff and nurses to timely respond to her request for assistance. [Phillips] was forced to transfer without assistance after waiting an hour to use the commode. [Phillips] "rolled out of bed because no one came to let her go to the bathroom."

As a result of this fall in April, Phillips sustained a fractured right index finger and a head injury.

Finally, Dr. Lechin noted that although Phillips "suffered from falls at least five times while in the care of the staff and attending physicians at the nursing home," her medical chart "does not document every fall or the injuries resulting from every fall, does not reflect that the nursing home performed an investigation with respect to each incident, and does not reflect any changes or updates in the care plan following any of the falls." According to Dr. Lechin, "failing to update her care plan or implement additional safety measures to prevent falls after she started falling in their facility" is a "gross deviation from the standard of care."

Specific to Hanif's failure to develop and implement a physical therapy plan, Dr. Lechin stated that Phillips sustained a fractured right wrist after a fall at Willowbrook in March 2018 and that, when she was taken to the emergency room after the April fall, it was determined that "her fractured wrist from the previous fall

was not healing." Dr. Lechin opined that this injury, as well as the injury to her right index finger, "caused constant pain and suffering" that was "prolonged by the failure to develop and implement a proper physical therapy plan." Dr. Lechin further opined that Phillips's bone fractures "would not have worsened and caused a severe decline in her health and substantial pain if the staff and attending physicians had developed and implemented a physical therapy plan." Thus, Dr. Lechin stated that Hanif breached the standard of care by "failing to develop and implement a physical therapy plan for [Phillips's] broken wrist following the first of her two major falls."

We conclude that Dr. Lechin's amended expert report adequately sets out what care was expected of Appellants, but not given. *Palacios*, 46 S.W.3d at 880. Specifically, Dr. Lechin's amended expert report puts Appellants on notice that, due to Phillips's fall risk, they were required to utilize a two-person assist with all activities including bed mobility and transfers, document every fall or the injuries resulting from every fall, perform an investigation with respect to each incident, update the care plan and implement additional safety measures to prevent future falls, and (with respect to Hanif) implement a physical therapy plan following major injuries to prevent prolonged pain and suffering. According to Dr. Lechin, Appellants failed to perform these duties and, therefore, breached the applicable standards of care. We are mindful that at this stage of the proceeding, all that is required is that Dr. Lechin's amended expert report inform Appellants of the specific

23

conduct McCammon has called into question and provide a basis for the trial court to conclude that the claims have merit. *See id.* at 879. We conclude that the above information related to standard of care and breach contained in Dr. Lechin's amended expert report adequately does so. *Id.*; *see also Walker v. Srivastava*, No. 14-19-00270-CV, 2020 WL 4092103, at *5 (Tex. App.—Houston [14th Dist.] July 21, 2020, no pet.) (mem. op.) (holding that statements describing applicable standard, to whom it applies, when it is to be followed, steps that should be taken to ensure its proper performance, and health care providers' failure to follow those steps, provided fair summary of applicable standard of care and breach).[7]

We overrule Willowbrook, Khoury, and Thota's second issue, and Hanif and Poonawala's first issue.

---

[7]    Willowbrook, Khoury, and Thota also argue that bed and chair alarms are never used with dementia patients because they scare and confuse such residents, and that the use of seatbelts and lap restraints would violate Phillips's rights as a patient. To the extent these appellants argue the amended expert report is insufficient because Dr. Lechin is incorrect in his conclusions about what the standard of care requires, we note that "the ultimate evidentiary value of the opinions proffered by [an expert] is a matter to be determined at summary judgment and beyond." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 226 (Tex. 2018); *see also Baty v. Futrell*, 543 S.W.3d 689, 697 (Tex. 2018) ("The parties to a medical-malpractice case may— and often do—disagree over what the standard of care in fact requires."). At this stage, whether those standards are reasonable is not relevant to the analysis of whether Dr. Lechin's amended expert report constitutes a good faith effort to comply with the Chapter 74's requirements. *See Peabody v. Manchac*, 567 S.W.3d 814, 823 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

### 3. Dr. Lechin's opinions as to causation are not conclusory.

Appellants also argue that Dr. Lechin's opinions as to causation are conclusory.[8] Focusing on the two major falls—one in March and one in April—Appellants contend that Dr. Lechin's amended expert report does not link these falls and the resulting injuries with Appellants' alleged deviations from the standard of care. More specifically, Appellants argue that Dr. Lechin fails to provide sufficient details about how these falls occurred, what injuries resulted, and how these injuries led to Phillips's decline in mental and physical health after leaving Willowbrook. We disagree.

With reference to causation, Dr. Lechin opined:

- Phillips fell at Willowbrook in March 2018, which resulted in a fractured right wrist. Dr. Lechin opined that this fall was caused by the nursing home's failure to, among other things, "provide a bed alarm" and "seek permission and use bed rails."

- Phillips suffered a second major fall in April 2018, which resulted in a visit to the emergency room and a fractured right index finger and head injury. Dr. Lechin opined that this fall was caused by the "failure of the staff and nurses to timely respond to [Phillips's] request for assistance. [Phillips] was forced to transfer without assistance after waiting an hour to use the commode. [Phillips] "rolled out of bed because no one came to let her go to the bathroom."

- Following Phillips's April 2018 fall, a CT scan was performed "to determine the extent of [Phillips's] head injury." Dr. Lechin acknowledged that the CT scan did not identify acute trauma but stated that this was common because these types of injuries "have a high probability of

---

[8] This issue is raised in Willowbrook, Khoury, and Thota's first issue, and Hanif and Poonawala's second issue.

resulting in subdural hematomas that can take months to present, especially in patients with dementia, which causes brain atrophy." Dr. Lechin further opined that "[c]hronic subdural hematoma is almost always associated with brain atrophy in elderly patients" and that it is "consistent with the same severe decline in physical and mental health suffered by [Phillips] following her removal from the nursing home." Dr. Lechin concluded that "[w]ithin a reasonable degree of medical certainty, chronic subdural hematoma caused by her fall on or about April 21, 2018 was a contributing factor to the severe decline [in Phillips's] physical and mental health prior to her death. It is with all medical probability that [Phillips's] falls and injuries were the proxima[te] cause of her pain and suffering and is the cause of the severe decline in her physical and mental health prior to her death."

- Although Phillips "required two-person assist with all activities including bed mobility and transfers, the staff did not provide her with this assistance," and this failure to provide assistance "caused her fall and injuries." "The failure to provide assistance caused bone fractures and head trauma. Had the staff provided [Phillips] with proper assistance, in reasonable medical probability, [Phillips] would not have suffered traumatic falls to the ground and suffered such severe injuries."

- Appellants' failure to implement Phillips's care plan, ensure that Phillips's care plan was "followed to prevent falls and injuries," "[i]mplement interventions after her falls such as bed alarms and chair alarms, self-releasing seat belts or lap buddies," and "[t]horoughly investigate [Phillips's] fall[s] and implement additional steps to prevent falls from repeating," caused Phillips to "fall multiple times, which resulted in bone fractures and head trauma." According to Dr. Lechin, these injuries "caused constant pain and suffering and were a contributing factor to the severe decline in her physical and mental health prior to her death. If the standards of care had been followed as outlined above, [Phillips] would not have fallen numerous times and sustained major injuries."

- Phillips would not have sustained major injuries, including a fractured wrist and head injury, if "the staff and attending physicians had developed and implemented an effective care plan that included interventions to prevent falls."

Courts under similar circumstances have held similar expert reports to be sufficient. For example, in *Harrington v. Schroeder*, the decedent sustained numerous injuries, some that were the result of falls and others that were the result of attacks by other residents, during her stay at a nursing home. No. 04-15-00136-CV, 2015 WL 9001573, at *7 (Tex. App.—San Antonio Dec. 16, 2015, pet. denied) (mem. op.). The plaintiff's expert opined that the standard of care applicable to the attending physician required that he "assist the facility in providing input into the resident's care plan to address these problems." *Id.* at *6. With respect to the falls the decedent sustained while at the nursing home, the expert opined that such input would include, among other things, "investigating the cause of injuries, lowering her bed, instituting bed rails, . . . instituting bed alarms, and ordering additional supervision and assistance." *Id.* In the causation section related to the falls, the expert opined that the decedent's falls and resulting injuries were caused by the physician's breaches of the above-mentioned standards of care. Specifically, the expert opined:

> [The physician] failed to properly assess [the decedent], including an assessment of her fall risks, and failed to provide proper input into [the decedent's] care plan to address falls and fall risks. If [the physician] had properly assessed [the decedent] and provided proper input into [her] care plan to address falls, in some of the ways enumerated above, in reasonable medical probability, [the decedent] would not have continued to suffer repeated falls and injuries[.]

27

*Id.* The San Antonio Court of Appeals, noting the preliminary stages of the proceeding, held that this report adequately discussed causation. *Id.* at \*7; *see also Peterson Reg'l Med. Ctr. v. O'Connell*, 387 S.W.3d 889, 894 (Tex. App.—San Antonio 2012, pet. denied) (expert report sufficient under Chapter 74 because expert opined that standard of care hospital owes elderly patient after administration of "fall inducing medications" requires additional monitoring to prevent falls, there was no evidence that additional monitoring was performed by nurse or physician, and expert opined on causal relationship between failure to provide additional monitoring and resulting fall, stating that "simple monitoring would have allowed facility to intervene and prevent [decedent's] fall that lead to his untimely death").

To the extent that Appellants argue Dr. Lechin's opinions are conclusory because they fail to provide sufficient details about the intervening eight months between Phillips's release from Willowbrook and her death, and as such, cannot rule out other possible causes of Phillips's decline in health, we disagree that this was required of Dr. Lechin at this stage of the proceeding. As noted above, section 74.351(r)(6) requires the expert report to provide a fair summary of the expert's opinions on the causal relationship between the failure of the physician or health care provider to provide care in accord with the pertinent standard of care and the injury, harm, or damages claimed. TEX. CIV. PRAC. & REM. CODE § 74.351(r)(6); *Bailey*, 402 S.W.3d at 369. "Nothing in section 74.351 suggests the preliminary

28

report is required to rule out every possible cause of the injury, harm, or damages claimed, especially given that section 74.351(s) limits discovery before a medical expert's report is filed." *Id.* Thus, Dr. Lechin was not required to rule out every other possible cause or contributing factor to Phillips's decline in health before her death.

We conclude that Dr. Lechin's report, when read in its entirety, explains how Phillips's injuries (i.e., the bone fractures and head injury) could have been avoided had Appellants adhered to the standard of care for a nursing home and its attending physician, including investigating and documenting each fall; implementing interventions after falls, such as bed alarms, chair alarms, self-releasing seat belts or lap buddies, in order to prevent future falls; and providing transfer and ambulatory assistance. *See Harrington*, 2015 WL 9001573, at *6–7; *Peterson*, 387 S.W.3d at 894. Dr. Lechin's report, therefore, adequately discusses causation so as to inform Appellants of the conduct that McCammon has called into question and to provide a basis for the trial court to conclude that McCammon's claims have merit. *See Palacios*, 46 S.W.3d at 879.

We overrule Willowbrook, Khoury, and Thota's first issue, and Hanif and Poonawala's second issue.

## Conclusion

In sum, we are mindful that all that is required is a "good faith effort" to comply with the statutory requirements. TEX. CIV. PRAC. & REM. CODE § 74.351(*l*).

To represent a good faith effort to provide a fair summary of his opinions Dr. Lechin was not required to marshal all of McCammon's proof, but only needed to include his opinion on each element—standard of care, breach, and causation. *See Palacios*, at 878–79. After reviewing Dr. Lechin's amended expert report, we conclude it met the requirements of making a good faith effort to provide a fair summary under *Palacios* because it informed Appellants of the specific conduct McCammon has called into question and provided a basis for the trial court to conclude that his claims have merit. *See id.* at 879. Keeping in mind that expert reports are a preliminary method to show a plaintiff has a viable cause of action that is not frivolous or without expert support, we hold that Dr. Lechin's amended expert report complied with section 74.351's standard of care, breach, and causation requirements and that the trial court did not abuse its discretion in failing to grant Appellants' motions to dismiss.

We affirm the trial court's order denying Appellants' motions to dismiss.


Amparo Guerra
Justice

Panel consists of Justices Hightower, Countiss, and Guerra.

30